J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
    borden@braunhagey.com
Jeffrey M. Theodore, Esq. (SBN: 324823)
    theodore@braunhagey.com
Robert Petraglia, Esq. (SBN: 264849)
    petraglia@braunhagey.com
Amy Senia, Esq. (SBN: 329134)
    senia@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 599-0210

Eric Schlabs, Esq. (*pro hac vice*)
    schlabs@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 829-9403

ATTORNEYS FOR PLAINTIFF
THE BETTER MEAT CO.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE BETTER MEAT CO., | Case No: 2:21-CV-02338-KJM-CKD |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS PAUL VRONSKY AND BOND CAPITAL MANAGEMENT LP TO DISMISS THE COMPLAINT** |
| v. | |
| EMERGY, Inc. d/b/a MEATI FOODS, PAUL VRONSKY, and BOND CAPITAL MANAGEMENT LP, | Date: May 6, 2022<br>Time: 10:00 AM<br>Location: Courtroom 3, 15th Floor<br>Judge: Hon. Kimberly J. Mueller |
| Defendants. | |

# **TABLE OF CONTENTS**

Page(s)

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

     A.    The Parties ................................................................................................ 2

          1.    The Better Meat Co. .............................................................. 2

          2.    Defendant.............................................................................. 2

     B.    BMC's Technology ................................................................................ 3

     C.    Defendant's Efforts to Suppress BMC's Fundraising and Inhibit Competition..... 4

     D.    BMC's Lawsuit and Defendant's Duplicative Action............................................. 5

ARGUMENT .................................................................................................................... 6

I.    BMC HAS STATED A CLAIM FOR TORTIOUS INTERFERENCE ........................... 6

     A.    The Complaint Sufficiently Alleges that Defendants Actually Disrupted BMC's Existing Investor Relationships ........................................ 8

     B.    The Complaint Sufficiently Alleges that Defendants' Interference Proximately Caused BMC's Harm.......................................................... 11

     C.    The Complaint Alleges Sufficient Facts to Plausibly Show that Defendants' Actions Were Independently Wrongful ........................ 12

II.    BMC SUFFICIENTLY ALLEGED DEFENDANTS VIOLATED THE UCL.............. 16

III.    CAL. CIV. CODE § 47 DOES NOT BAR BMC'S CLAIMS BECAUSE THE COMPLAINT ALLEGES THAT DEFENDANTS ACTED IN BAD FAITH.......................................................................................................... 17

     A.    The Litigation Privilege Does Not Apply............................................ 18

1

B.    The Common Interest Privilege Does Not Apply..................................................... 19

2    IV.    BMC SHOULD BE GRANTED LEAVE TO AMEND ................................................... 20

3
CONCLUSION.......................................................................................................................... 20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS PAUL VRONSKY AND BOND CAPITAL
MANAGEMENT LP TO DISMISS THE COMPLAINT

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

## <u>CASES</u>

4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................... 6

5

*Behr Process Corp. v. RPM Int'l Inc.*,
  No. SACV-14-156-JLS-DFMx, 2014 WL 12584385 (C.D. Cal. May 20, 2014) ................. 9, 10, 11

6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................... 6

7

*Brown v. Kelly Broad. Co.*,
  48 Cal. 3d 711 (1989) ................................................................................................ 19

8

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
  20 Cal. 4th 163 (1999) ............................................................................................... 16

9

*City of Costa Mesa v. D'Alessio Investments, LLC*,
  214 Cal. App. 4th 358 (2013) ..................................................................................... 14

10

*Clayworth v. Pfizer, Inc.*,
  49 Cal. 4th 758 (2010) ............................................................................................... 16

11

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) .................................................................................... 20

12

*Finch Aerospace Corp. v. City of San Diego*,
  8 Cal. App. 5th 1248 (2017) ....................................................................................... 14

13

*Ghazarian v. Magellan Health, Inc.*,
  53 Cal. App. 5th 171 (2020) ....................................................................................... 16

14

*Infectolab Americas LLC v. ArminLabs GmbH*,
  No. 20-CV-03318-VKD, 2021 WL 292182 (N.D. Cal. Jan. 28, 2021) ................................. 10, 11

15

*In re Tracht Gut, LLC*,
  836 F.3d 1146 (9th Cir. 2016) ...................................................................................... 6

16

*Julian Bakery, Inc. v. Healthsource Int'l, Inc.*,
  16-CV-2594-JAH (KSC), 2018 WL 1524499 (S.D. Cal. Mar. 28, 2018) ............................. 10, 11

17

*Kashian v. Harriman*,
  98 Cal. App. 4th 892 (2002) ....................................................................................... 19

18

*Klem v. Access Ins. Co.*,
  17 Cal. App. 5th 595 (2017) ....................................................................................... 18

19

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ............................................................................................... 7

20

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ........................................................................................... 16, 17

21

*Luxpro Corp. v. Apple Inc.*,
  No. C 10-03058 JSW, 2011 WL 1086027 (N.D. Cal. Mar. 24, 2011) ................................... 8

22

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,
  50 Cal. 3d 1118 (1990) .......................................................................................... 6, 7, 9

23

*Quelimane Co. v. Stewart Title Guaranty Co.*,
  19 Cal. 4th 26 (1998) ............................................................................................. 7, 13

24

*Rankins v. Bio-Nutritional Rsch. Grp., Inc.*,
  No. 8:20-CV-01489-JWH-DFMX, 2020 WL 10786536 (C.D. Cal. Nov. 30, 2020) ................. 10, 11

25

26

27

28

PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS PAUL VRONSKY AND BOND CAPITAL
MANAGEMENT LP TO DISMISS THE COMPLAINT

*San Joaquin Gen. Hosp. v. United Healthcare Ins. Co.*,
   No. 2:16-CV-01904-KJM-EFB, 2017 WL 1093835 (E.D. Cal. Mar. 23, 2017)............................. 6
*San Jose Construction, Inc. v. S.B.C.C., Inc.*,
   155 Cal. App. 4th 1528 (2007) ................................................................................................. 13
*Silberg v. Anderson*,
   786 P.2d 365 (1990) ................................................................................................................. 18
*Silicon Labs Integration, Inc. v. Melman*,
   No. C-08-04030-RMW, 2010 WL 890140 (N.D. Cal. Mar. 8, 2010) .................................... 13, 14
*Strawn v. Morris, Polich & Purdy, LLP*,
   30 Cal. App.5th 1087 (2019) ..................................................................................................... 18
*Sybersound Recs., Inc. v. UAV Corp.*,
   *517 F.3d 1137 (9th Cir. 2008)* .............................................................................................. 10, 11
*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ................................................................................................... 15

## STATUTES

18 U.S.C. § 1836 ............................................................................................................................. 5
35 U.S.C. § 256 ............................................................................................................................... 5
Cal. Civ. Code § 47 ............................................................................................................... 17, 18, 19
Cal. Civ. Code § 3426 ...................................................................................................................... 5
California Bus. & Prof. Code §§ 17200 ............................................................................................ 5

## RULES

Federal Rule of Civil Procedure 8(a)(2) ........................................................................................... 6

Plaintiff The Better Meat Co. ("BMC") respectfully submits this Opposition to the Motion of Defendants Paul Vronsky and Bond Capital Management LP ("Defendants") to Dismiss the Complaint.

**INTRODUCTION**

BMC is a Sacramento-based startup that has invented and patented a healthy and eco-friendly mycelium-based meat substitute. Defendant Emergy is a heavily-funded company that has pursued various mycelium ventures, such as making batteries, toothpaste, and snacking chips, and is now trying to sell a meat substitute. Unlike BMC, Emergy's patent applications have been uniformly rejected by the Patent & Trademark Office because they are not novel. Unable to compete through innovation, Emergy has tried to use its superior resources to throttle competition.

Here, Emergy coordinated with its investor Defendant Bond Capital and Bond's principal, Defendant Paul Vronsky, to tortiously interfere with BMC's ability to raise capital. First, Emergy sent a letter to BMC falsely claiming that it was going to sue BMC for supposedly taking Emergy's technology. Minutes later, Bond and Vronsky gratuitously contacted BMC's lead investor to inform it that BMC was going to be sued—but without actually suing BMC. As intended, Defendants' disparagement of BMC and its technology threatened BMC's viability and made fundraising more difficult and expensive.

While Defendants were unwilling to test their allegations in a court of law despite six months of threats, BMC filed suit for tortious interference and unfair competition. Defendants have moved to dismiss the Complaint on the grounds that: (1) BMC's tortious interference claim is not sufficiently pled; (2) BMC lacks standing under the UCL for failure to plead an economic injury; and (3) the litigation and common-interest privileges bar BMC's claims. (Dkt. No. 29 ("Mot.") at 4-18.) These arguments ignore the Complaint's express allegations and defy the reasonable inferences to which BMC is entitled under the Rule 12(b)(6) standard.

Defendants' primary contention—which Defendants reprise in variations throughout the Motion—is that Defendants Bond and Vronsky did not cause BMC's harm. Their argument is that Defendant Emergy sent its false letter before Defendants Bond and Vronsky sent theirs, and therefore, at the time that they contacted BMC's lead investor, the damage to BMC was already

done because BMC was already obligated to disclose Defendant Emergy's threats to investors. What this theory ignores, however, is the Complaint's allegations link Emergy, Bond, and Mr. Vronsky's conduct together as a coordinated, joint effort to disrupt BMC's investor relationships, and hamper BMC's ability to raise startup capital. Assessing Defendants' arguments in the context of the Complaint as a whole and drawing all reasonable inferences in BMC's favor, as the Court must do, the Motion should be denied.

## BACKGROUND

### A.    The Parties

#### 1.    The Better Meat Co.

BMC is a Sacramento-based startup that was founded in early 2018 by Paul Shapiro, Joanna Bromley, and Adam Yee to create next-generation animal-free protein. (Compl. ¶¶ 1, 15.) BMC's breakthrough technology has resulted in the creation of animal-free products that can be used as meat substitutes or to enhance animal meat—improving health, animal welfare, and environmental sustainability at a competitive cost. (*Id.* ¶ 15.) BMC's "Rhiza" product is a whole food, complete protein ingredient that is versatile, allergen-free, neutral in taste, and has the natural texture of animal meat. (*Id.* ¶ 16.) It is shelf stable and contains more protein than eggs, more iron than beef, more fiber than oats, and more potassium than bananas. (*Id.*) The Rhiza product and the underlying unique technology is the result of extensive time, effort, and resources devoted by BMC to researching mycelium-based foods. (*Id.* ¶ 17.) The Complaint alleges that BMC is in the process of raising Series A funding to build a facility that has the capacity to produce its ingredients at a commercial scale. (*Id.* ¶ 1.)

#### 2.    Defendant

Defendant Emergy was founded in 2015 to carbonize mycelium for use in batteries. (*Id.* ¶ 20.) That same year, Defendant was accepted into the Chain Reaction Innovations (CRI) program at the Department of Energy's Argonne National Laboratory. (*Id.* ¶ 21.) Based on the evidence available to date, Defendant was focused on researching battery technology, not meat replacement uses of mycelium during its time at the Department of Energy. (*Id.* ¶ 35.)

Since then, Defendant has used its significant venture capital backing to cycle through various focuses. (*Id.* ¶ 22.) In 2018, after abandoning battery research, Defendant launched a new entity called BTRFY to market a potato chip alternative made from mycelium. When that idea failed, in June 2019, Defendant shifted its business model to focus on animal-free meat and changed its d/b/a from Emergy to "Meati Foods." (*Id.* ¶ 23.)

**B.     BMC's Technology**

In July 2021, BMC was issued U.S. Patent No. 11,058,137 ("the BMC Patent"). The heart of this patent, as described in claim 1, is a cultured fungal biomass with a novel combination of particle sizes and water weights that allows mycelium products to remain shelf stable while also maintaining a pleasing and meat-like texture. (*Id.* ¶ 3.)

The named inventor on the BMC Patent is Augustus Pattillo, who joined BMC as its Chief Technology Officer in March 2019. Prior to that, between December 2017 and May 2018, Mr. Pattillo held an educational fellowship at the Department of Energy. (*Id.* ¶ 30.) As part of this fellowship, he conducted research with Defendant during the period in which Defendant was focused on carbonization of mycelium for energy storage. (*Id.*) Following Mr. Pattillo's departure from his fellowship in May 2018, he opened his own laboratory and began researching and developing meat replacement uses of mycelium, and on September 20, 2018, he filed U.S. Provisional Patent Application No. 67/733,925 ("the '925 Provisional"), from which the BMC Patent claims priority.

By contrast, Defendant has filed multiple patent applications on subject matter distinct from that of the BMC Patent, but all have been rejected by the United States Patent and Trademark Office on grounds that they do not contain anything novel or non-obvious. For example, Defendant's U.S. Patent Application No. 16/435,261, which was filed on June 14, 2019, and purports to claim a "method of growing fungal mycelium and forming edible food products includes growing fungal cells in a growth media such that the fungal cells produce mycelium," received a final rejection from the examiner on November 24, 2021.

PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS PAUL VRONSKY AND BOND CAPITAL
MANAGEMENT LP TO DISMISS THE COMPLAINT

### C.   Defendant's Efforts to Suppress BMC's Fundraising and Inhibit Competition

After learning that BMC had received a patent for its shelf stable product, Defendant began using its superior financial resources to try to undermine BMC's business. Defendant's first tactic was to privately claim to BMC that it owned the BMC Patent. On July 16, 2021—three days after the Patent and Trademark Office issued the BMC Patent— Defendant sent twin letters to BMC and Mr. Pattillo, the inventor of the BMC Patent. (Dkt. No. 1 ¶ 30.) In its letters, Defendant falsely claimed that three years earlier, Mr. Pattillo had stolen the inventions in the BMC Patent from Defendant while he was on an educational fellowship at the Department of Energy, long before the time that Defendant shifted its focus from making batteries, toothpaste, and other products to refocus on meat substitutes (*Id.*) Defendant also accused BMC and Mr. Pattillo of trade secret misappropriation and demanded that BMC withdraw its Rhiza product from the market. (*Id.* ¶ 31.) The letter did not identify any trade secrets or contributions from Defendant to the BMC Patent. (*Id.* ¶ 34.)

After BMC invited Defendant to provide evidence to support its allegations, on August 25, 2021, Defendant sent BMC its "evidence," which consisted largely of unidentified and undated pictures of mycelial discs and chunks—all of the sort that could, are, and have been grown by countless investigators, laboratories, and fungal biomass producers for decades. (*Id.* ¶ 35.) Defendant provided no evidence that it (i) had identified the novel claim terms of the BMC Patent, (ii) had shared any of the concepts at issue with Mr. Pattillo, or (iii) was even actively researching meat replacement uses of mycelium prior to 2019 when it pivoted away from making batteries, toothpaste, and snacking chips. (*Id.* ¶ 35.)

On September 8, 2021, BMC responded to Defendant and explained that the materials it had provided were not "evidence" that Defendant had developed BMC's technology or owned the BMC Patent. (*Id.* ¶ 36.) BMC offered to discuss the matter further or to review any other evidence that Defendant had. Defendant did not respond and did not contact BMC for more than three months. (*Id.* ¶ 37.)

Defendant appeared to have dropped the matter – until December 2021, when it learned that BMC was soliciting a Series A investment round. (*Id.* ¶¶ 38-40.) Defendant then took prompt and

PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS PAUL VRONSKY AND BOND CAPITAL
MANAGEMENT LP TO DISMISS THE COMPLAINT

1   coordinated action to undermine BMC's ability to raise capital. (*Id*. ¶ 41.) First, Defendant sent

2   BMC a letter accusing BMC of "misappropriation of Meati's trade secrets and unfair competition"

3   (the "December 15 Letter"). (*Id.* ¶ 42.) The December 15 Letter expressed Defendant's intention to

4   "move forward with legal action" and "fil[e] a complaint . . . in the immediate future" but did not

5   make any demand, offer to negotiate, or otherwise seek to accomplish anything from a litigation

6   perspective. (*Id.*) Thirteen minutes later, Defendant's investors, Defendants Bond Capital and Paul

7   Vronsky sent an email to BMC's lead investor (the "Lead Investor") in the Series A round in which

8   it falsely represented that BMC and Defendant Emergy were in a "pretty significant trade secret

9   and patent dispute" (the "Vronsky Email"). (*Id.* ¶¶ 46-50.)

10          This conduct has had a significant negative impact on BMC's ability to raise funds and the

11   terms on which it can do so. Defendant's actions have disrupted BMC's relationships with its

12   investors, made it more difficult to perform on the term sheet BMC had entered into with its lead

13   investor, and damaged BMC's ability to raise investment capital on favorable terms.  (*Id.* ¶¶ 39, 50,

14   60-61.)

15          **D.   BMC's Lawsuit and Defendant's Duplicative Action**

16          Despite Defendant's threat of an "imminent suit," no suit was filed. Instead, on December

17   17, 2021, BMC filed the instant case against Plaintiff and its investor to redress their interference

18   with BMC's Series A fundraising round and put to rest their false claim that they own the BMC

19   Patent. (*Id.* ¶ 1.) BMC asserts claims for tortious interference, unfair competition under the

20   California Bus. & Prof. Code §§ 17200 et seq. ("UCL"), and declaratory judgment of inventorship

21   of the BMC Patent. (*Id.* ¶¶ 52-73.)

22          For another ten days thereafter, Defendant was silent. Then, on December 27, 2021,

23   Defendant filed a separate case. That complaint purports to assert ten claims: (1) trade secret

24   misappropriation under the Defend Trade Secrets Act 18 U.S.C. § 1836); (2) trade secret

25   misappropriation under CUTSA Cal. Civ. Code § 3426) (CUTSA); (3) unfair competition under

26   the UCL; (4) unjust enrichment; (5) correction of inventorship 35 U.S.C. § 256); (6) conversion;

27   (7) breach of contract; (8) breach of implied contract; (9) inducement to breach of contract; and

28   (10) tortious interference. (Case No. 2:21-cv-02417-KJM-CKD, Dkt. No. 1.) Defendant's

1 complaint repeated the same allegations and evidence laid out in the August 25, 2021 letter that

2 BMC had already refuted in detail.

### ARGUMENT

4      "At the motion to dismiss phase, the trial court must accept as true all facts alleged in the

5 complaint and draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836

6 F.3d 1146, 1150 (9th Cir. 2016); *see also San Joaquin Gen. Hosp. v. United Healthcare Ins. Co.*,

7 No. 2:16-CV-01904-KJM-EFB, 2017 WL 1093835, at *1 (E.D. Cal. Mar. 23, 2017) (in ruling on a

8 motion to dismiss, the Court must "assume [that]" the plaintiff's "factual allegations are true and

9 draw[] reasonable inferences from them"). Federal Rule of Civil Procedure 8(a)(2) requires only "a

10 short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give

11 the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl.*

12 *Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint attacked by a Rule 12(b)(6) motion to

13 dismiss thus does not require "detailed factual allegations," only sufficient "facts to state a claim to

14 relief that is plausible on its face." *Id.* at 570. "Evaluation under Rule 12(b)(6) is a context-specific

15 task drawing on 'judicial experience and common sense.'" *San Joaquin*, 2017 WL 1093835, at *1

16 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

### I.   BMC HAS STATED A CLAIM FOR TORTIOUS INTERFERENCE

18      BMC's tortious interference claim incorporates both the torts of interference with contract

19 and interference with prospective economic advantage. The Complaint has alleged sufficient facts

20 to state plausible claims for both torts, and Defendants' Motion should be denied.

21      To state a claim for intentional interference with contractual relations, a plaintiff must

22 allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this

23 contract; (3) defendant's intentional acts designed to induce a breach or disruption of the

24 contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5)

25 resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126

26 (1990). A "[p]laintiff need not allege an actual or inevitable breach of contract in order to state a

27 claim for disruption of contractual relations. . . . [I]nterference with the plaintiff's performance may

28

PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS PAUL VRONSKY AND BOND CAPITAL
MANAGEMENT LP TO DISMISS THE COMPLAINT

give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more burdensome." *Id.*

A claim for interference with prospective economic advantage has similar elements: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional and independently wrongful acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). The practical difference between the two torts is that a prospective economic advantage claim requires that "the defendant's conduct be wrongful apart from the interference with the contract itself." *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55 (1998). Given these similarities, BMC refers to both torts collectively as "tortious interference."

Defendants assert that BMC fails to allege: (1) an actual disruption of a specific third-party relationship; (2) harm proximately caused by Defendants; and (3) that Defendants' actions were independently wrongful. (Mot. at 5-11.) Defendants thus concede that BMC has sufficiently alleged the first two elements of both torts. (*See id*.) As a result, only the latter three tortious interference elements are at issue in this Motion. Defendants' arguments fail for at least three reasons:

***First***, the Complaint's allegations that Defendants made performance of BMC's existing agreements with its investors "more difficult," and negatively impacted its "ability to obtain investments on favorable terms" constitute actual disruption of its relationships with its investors.

***Second***, because the Complaint alleges that Emergy, Bond, and Mr. Vronsky were working in concert to interfere with BMC's investor relationships, it is more than plausible that Defendants Bond and Vronsky's coordinated email to Lead Investor was a substantial factor in causing BMC's harm.

***Third***, the Complaint's allegations support a reasonable inference that Defendants' interference was independently actionable and wrongful as fraudulent misrepresentation, slander of title, or trade libel.

1

### A.   The Complaint Sufficiently Alleges that Defendants Actually Disrupted BMC's Existing Investor Relationships

2   Defendants first argue that BMC fails to state claims for tortious interference because the

3   Complaint does not "plead a *specific* actual disruption to a *specific* relationship." (Mot. at 5-6

4   (emphasis in original).) The Court should reject this assertion, as it ignores express allegations in

5   the Complaint and overstates the degree of specificity required at the pleading stage.

6   BMC has plainly alleged that Defendants' tortious conduct disrupted "specific"

7   relationships: those with BMC's "prospective and current investors." (Compl. ¶ 53; *see also id.*

8   ¶ 59 ("Defendants' wrongful acts were designed to disrupt the relationship and agreements ***between***

9   ***Plaintiff and its investors, most prominently the Lead Investor***.") (emphasis added).) To the extent

10  that Defendants contend that BMC must specifically identify those investors or the Lead Investor

11  by name, Defendants are mistaken.

12  *Luxpro Corp. v. Apple Inc.* is instructive on this point. No. C 10-03058 JSW, 2011 WL

13  1086027, *7 (N.D. Cal. Mar. 24, 2011). The court in *Luxpro* rejected Apple's argument that to state

14  a plausible claim for tortious interference, the plaintiff was required to "specifically name every

15  entity with whom Apple allegedly interfered." *Id.* The *Luxpro* court pointed to several other courts

16  which held that "specifying a third party group is sufficient to state a claim, even if the plaintiff

17  does not individually name each member of the group." *Id.* (listing cases, which included alleged

18  interference with third-party "franchisees," "customers," "patients," and "purchasers"). Applying

19  this rule, the court held that the plaintiff had sufficiently stated a tortious interference claim by

20  alleging the disruption of its relationships with specified third-party groups—plaintiff's

21  "commercial partners (*i.e.* retailers, distributors and suppliers)." *Id.* at *8. So too here. As in

22  *Luxpro*, BMC need not specify its Lead Investor or any other investors by name to state a plausible

23  claim for tortious interference. It suffices for BMC to allege that Defendants tortiously interfered

24  with BMC's existing business relationships with third-party groups: BMC's investors.

25  Defendants' argument that the Complaint alleges disruption in a conclusory manner without

26  allegations of "specific" or actual disruption also fails (Mot. at 5-6), as it takes BMC's allegation of

27  harm out of the context of the rest of the allegations in the Complaint. BMC alleges that it signed a

28  term sheet for the Series A investment round with the Lead Investor, a prominent and well-

regarded California private equity investor with many years in the industry and extensive contacts and name recognition, and that BMC used Lead Investor's name while soliciting additional investors for the fundraising round. (Compl. ¶ 39.) BMC also alleges that BMC's breakthrough patent and technology are highly material to its attractiveness as a target for investment, and that Defendants acted to undermine BMC's ability to raise the capital it needs to build a commercial production facility. (*Id.* ¶¶ 40-41.) Moreover, BMC expressly alleges that Defendants actually disrupted its business relationships by making performance of its existing agreements the Lead Investor investors "more difficult," and "negatively impact[ing its] ability to obtain investments on favorable terms." (*Id.* ¶¶ 60-61.)

Drawing all reasonable inferences in BMC's favor, as the Court must do at this stage, it is more than plausible that Defendants' spreading of false claims about BMC's IP—the core technology of BMC's business and a significant asset in its valuation—to BMC's most prominent and important investor made performance of its term sheet with this investor "more difficult," and harmed BMC's ability to raise capital from other potential investors on favorable terms. Actual disruption under these circumstances is not just plausible, but obvious. False claims of stolen trade secrets and intellectual property necessarily damage the business reputation of an emerging startup company, its ability to acquire new investment agreements, and its performance of existing investment agreements in a variety of ways. For example, such false claims may result in prospective and current investors undertaking additional due diligence and investigation, expending additional and unexpected legal fees which are typically capped in a term sheet, increasing the perceived risk of investment and therefore diluting the company's valuation, extending the length of time required to agree on material terms of an investment agreement, and reducing the company's bargaining power in negotiation of investment terms.

Courts have ruled that it suffices to plead that the disrupting party's actions made the plaintiff's performance of its contractual obligations "more costly or more burdensome." *See Pac. Gas*, 50 Cal. 3d at 1129. For example, the court in *Behr Process Corp. v. RPM Int'l Inc.* rejected an argument that the actual disruption element was pled in a conclusory manner where the pleading party supported its tortious interference claim with allegations similar to BMC's here. No. SACV-

1   14-156-JLS-DFMx, 2014 WL 12584385, at *2 (C.D. Cal. May 20, 2014). The defendants, the

2   pleading party in *Behr*, alleged that the plaintiff made a material misrepresentation to a third-party

3   that defendants had contracted with regarding the nature of the pending litigation between the

4   plaintiff and defendants, which made "performance of [defendants'] contract [with the third party]

5   more expensive and/or difficult" and damaged defendants' "business reputation and goodwill." *Id.*

6   In reviewing these allegations, the *Behr* court held that it was "plausible that the alleged

7   misrepresentation made performance under the contract more costly or burdensome." *Id.*

8          As in *Behr*, BMC's tortious interference claims are not merely conclusory, but allege an

9   actual disruption between the relationship with BMC and its Lead Investor, *i.e.*, that Defendants'

10  interference made BMC's performance of its term sheet more difficult, and damaged BMC's ability

11  to obtain capital and other investments on favorable terms.

12         Defendants' reliance on *Rankins v. Bio-Nutritional Rsch. Grp., Inc.*, *Julian Bakery, Inc. v.*

13  *Healthsource Int'l, Inc.*, *Infectolab Americas LLC v. ArminLabs GmbH*, and *Sybersound Recs., Inc.*

14  *v. UAV Corp.* is therefore misplaced. (Mot. at 5-6 (citing No. 8:20-CV-01489-JWH-DFMX, 2020

15  WL 10786536, at *2 (C.D. Cal. Nov. 30, 2020); 16-CV-2594-JAH (KSC), 2018 WL 1524499, at

16  *8 (S.D. Cal. Mar. 28, 2018); No. 20-CV-03318-VKD, 2021 WL 292182, at *5 (N.D. Cal. Jan. 28,

17  2021); 517 F.3d 1137, 1151 (9th Cir. 2008)).) The plaintiffs in *Rankins* merely alleged that the

18  defendant's "unauthorized use of Plaintiff's trade slogan invariably disrupts the economic

19  relationship between Plaintiff and its customer base." 2020 WL 10786536, at *2. Similarly, in

20  *Julian Bakery*, the plaintiff alleged that the defendant attempted to solicit some of the plaintiff's

21  customers but alleged no "specific disruption with those relationships." 2018 WL 1524499, at *8.

22  Likewise, in *Infectolab*, the plaintiff alleged that the defendant "caused breach or disruption of [the

23  Agreement] and resulted in damages to [plaintiff]" and that defendant's conduct "constitutes an

24  injurious interference with [plaintiff's] prospective business advantage" based on its "existing and

25  prospective business relationship with [the third party]." 2021 WL 292182, at *5. Finally, in

26  *Sybersound*, the plaintiff alleged that it had "been harmed because its ongoing business and

27  economic relationships with Customers have been disrupted." 517 F.3d at 1151. The *Sybersound*

28

1    court explained that this allegation was merely conclusory because it did not "allege, for example,

2    that it lost a contract nor that a negotiation with a Customer failed." *Id.*

3         Unlike the general allegations of disruption in these four cases, BMC has specifically pled

4    what the actual disruption was and how it economically harmed BMC's valuation and ability to

5    obtain additional capital in its fundraising round. (*See* Compl. ¶¶ 60-61.) BMC alleges that

6    Defendants actually disrupted its business relationships with its prospective investors by negatively

7    impacting its ability to obtain investments on favorable terms, and its existing agreements with

8    current investors by making performance of those agreements more arduous and burdensome. (*See*

9    *id.*) BMC's allegations are thus more akin to the hypothetical examples that the court in

10   *Sybersound* stated would be sufficient (*i.e.*, a lost contract or failed customer negotiation) than the

11   general and merely conclusory allegations of disruption alleged by the plaintiffs in *Rankins*, *Julian*

12   *Bakery*, *Infectolab*, and *Sybersound*. Defendants cite to no authority endorsing dismissal of claims

13   under the circumstances present here.

14        Accordingly, the Court should reject Defendants' actual disruption argument and deny the

15   Motion on this ground.

16   **B.     The Complaint Sufficiently Alleges that Defendants' Interference Proximately
         Caused BMC's Harm**

17

18        Defendants assert that BMC has not plausibly alleged (1) the existence of a specific harm

     that was (2) caused by Defendants Bond Capital and Mr. Vronsky. (Mot. at 7-8.) For the same

19   reasons discussed above, the Court should reject the first contention. BMC has pled harm by

20   alleging that Defendants' interference made BMC's performance of its existing agreements with

21   investors more difficult, and negatively impacted its ability to obtain investments on favorable

22   terms and generate capital. (Compl. ¶¶ 60-61.) At the motion to dismiss stage, the Court may

23   reasonably infer from these allegations that BMC's current and prospective investments and

24   agreements changed to BMC's detriment. *See Behr*, 2014 WL 12584385, at *2.

25        Defendants' second contention also relies on a strained interpretation of BMC's factual

26   allegations and improperly isolates certain allegations from the broader factual context in the

27   Complaint. The parties agree that BMC need allege only that Defendants' conduct was a

28

PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS PAUL VRONSKY AND BOND CAPITAL
MANAGEMENT LP TO DISMISS THE COMPLAINT

1  "substantial factor" in causing its harm. (See Mot. at 7-8); *see also* Judicial Council of California

2  Civil Jury Instructions (2022 ed.), CACI No. 2201, *Intentional Interference With Contractual*

3  *Relations - Essential Factual Elements*; CACI No. 2202, *Intentional Interference With Prospective*

4  *Economic Relations - Essential Factual Elements*. Yet, Defendants argue that because BMC would

5  have been required to disclose Defendant Emergy's December 15 Letter to Lead Investor and other

6  prospective and current investors anyway, their email of 13 minutes later could not have been a

7  "substantial factor" in causing BMC's harm. (Mot. at 8.)

8  This assertion ignores the full set of allegations in the Complaint, which explain that

9  Emergy and Mr. Vronsky were working in concert to interfere with BMC's relationship with Lead

10  Investor and its ability to raise capital. (Compl. ¶ 48 ("Vronsky sent his email on behalf of, in

11  coordination with, and at the direction of Emergy and with knowledge of Emergy's

12  communications with BMC.").) Mr. Vronsky's email was not sent in a vacuum; it was Defendants'

13  coordinated one-two punch that substantially caused BMC's harm. Defendant Emergy sent the

14  December 15 Letter to BMC in bad faith, and Defendants Bond Capital and Mr. Vronsky, acting as

15  Emergy's agents, sent the Vronsky Email to BMC's Lead Investor ***thirteen minutes later***. (*Id.* ¶¶

16  46, 56.) The timing of this joint and orchestrated effort ensured not only that the Lead Investor

17  became aware of Defendants' false threats and allegations immediately, but also that BMC would

18  be deprived of the opportunity to disclose Defendants' meritless position to investors on BMC's

19  own time and terms, *i.e.*, in a manner which would have allowed BMC to answer potential

20  questions and assuage any potential concerns on the spot.

21  Accepting all of these allegations as true and drawing all reasonable inferences in BMC's

22  favor, it is more than plausible that Defendants' coordinated efforts were a substantial factor in

23  frustrating BMC's performance of its existing contracts and undermining its ability to raise capital

24  on favorable terms.

25  **C.      The Complaint Alleges Sufficient Facts to Plausibly Show that Defendants' Actions Were Independently Wrongful**

26  Defendants also assert that the Complaint lacks facts plausibly showing that Defendants'

27  actions were "independently wrongful" by some measure "other than the act of interference itself."

28

1  (Mot. at 8-11.) This argument too fails. With respect to BMC's interference with contractual

2  relations claim, BMC need not plead an independently wrongful act. *See Quelimane*, 19 Cal. 4th at

3  55 ("Because interference with an existing contract receives greater solicitude than does

4  interference with prospective economic advantage, it is not necessary that the defendant's conduct

5  be wrongful apart from the interference with the contract itself.") (internal citation omitted). Here,

6  BMC alleges that it had a term sheet with the Lead Investor regarding raising of funds, the

7  performance of which was disrupted and made "more difficult" by Defendant's interference.  (*Id.*

8  ¶¶ 39, 60.)  No further wrongful conduct is required beyond the interference itself.

9        With respect to BMC's interference with prospective economic relations claim, BMC has

10  pled facts that demonstrate Defendants' conduct is independently wrongful and actionable as

11  several different common law and statutory torts. "An act is independently wrongful if it is

12  unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or

13  other determinable legal standard." *San Jose Construction, Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th

14  1528, 1545 (2007) (internal citations, alterations, and quotation marks omitted). Here, BMC's

15  allegations that Defendants threatened BMC with litigation in bad faith, falsely claimed to own

16  BMC's intellectual property, and intentionally misrepresented the nature of BMC's dispute with

17  Defendants also constitute independently wrongful acts. In particular, Defendants' conduct is

18  independently actionable as both fraudulent misrepresentation and anticompetitive conduct

19  amounting to the common law torts of trade libel and/or slander to title.

20        Defendants contend that the Complaint fails to allege fraudulent misrepresentation and

21  anticompetitive conduct because (i) BMC has not pled falsity; (ii) Mr. Vronsky's statement about

22  BMC and Emergy being in a "pretty significant trade secrets dispute" is an opinion statement; (iii)

23  BMC has not pled justifiable reliance; and (iv) BMC cannot rely on its UCL claim for an

24  independently wrongful act. (Mot. at 9-11.) These assertions ignore the express allegations of the

25  Complaint and attempt to skirt the reasonable inferences to which BMC is entitled.

26        *Silicon Labs Integration, Inc. v. Melman* provides a helpful illustration of facts that

27  sufficiently allege an "independently wrongful act." No. C-08-04030-RMW, 2010 WL 890140, at

28  *4 (N.D. Cal. Mar. 8, 2010). In that case, the plaintiff's "only allegation of a specific wrongful act"

PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS PAUL VRONSKY AND BOND CAPITAL
MANAGEMENT LP TO DISMISS THE COMPLAINT

1   was the defendant's allegedly false statement about the quality of plaintiff's products to a third-

2   party with whom plaintiff was negotiating a sales contract. *Id.* at \*2-4. The *Silicon Labs* court

3   denied defendant's motion to dismiss, holding that plaintiff's "allegation of product disparagement

4   is sufficient to meet the required element of an independently wrongful act." *Id.* at \*4.

5            The same rationale applies here. Much like the product disparagement alleged in *Silicon*

6   *Labs*, Defendants' false statements to Lead Investor about the ownership of BMC's core

7   technology, intellectual property, and the BMC Patent plausibly amount to slander of title and trade

8   libel—both of which constitute independently actionable and wrongful acts. *See Finch Aerospace*

9   *Corp. v. City of San Diego*, 8 Cal. App. 5th 1248, 1253 (2017) ("[S]lander of title is not a form of

10   deceit. It is a form of the separate common law tort of disparagement, also sometimes referred to as

11   injurious falsehood. . . . [it] requires the existence of a 'misleading statement that (1) specifically

12   refers to the plaintiff's product or business and (2) clearly derogates that product or business.'");

13   *City of Costa Mesa v. D'Alessio Investments, LLC*, 214 Cal. App. 4th 358, 376 (2013) ("Trade libel

14   is the publication of matter disparaging the quality of another's property, which the publisher

15   should recognize is likely to cause pecuniary loss to the owner. The tort encompasses all false

16   statements concerning the quality of services or product of a business which are intended to cause

17   that business financial harm and in fact do so.") (internal quotation marks and citations omitted).

18            BMC has plainly alleged the falsity of Defendants' representations to BMC and its Lead

19   Investor. The Complaint alleges that Defendants Emergy, Bond, and Mr. Vronsky worked in

20   concert and "coordinated the sending of false allegations and demands to BMC and the

21   presumptive lead investor in its Series A round with the intent of deterring any investment," and

22   "falsely claimed to own and to have invented BMC's core technologies." (Compl. ¶¶ 3-4, 56-57.)

23   As explained above, Bond and Mr. Vronsky's email to Lead Investor must be viewed in the context

24   of their coordination with Emergy in pursuit of their shared goal to harm BMC.  (*Id.* ¶ 47.)  Bond

25   and Mr. Vronsky knew that by emailing the Lead Investor about a supposed "trade secret dispute,"

26   he was effectively "bring[ing] to the attention of the Lead Investor in California the false

27   statements in Emergy's letters that it and not BMC had invented the novel contributions of the '150

28   Application and '137 Patent."  (*Id.* ¶ 49.)

1        To the extent that Defendants argue BMC has not met Rule 9(b)'s heightened pleading

2  standard for fraudulent misrepresentation, it is hard to imagine how the Complaint's allegations

3  could have been more detailed, since BMC has pled the specific time and date of the December 15

4  Letter to BMC and Defendants' Vronsky Email to the Lead Investor, Defendants' exact words in

5  those communications, which statements in those communications were false, and why. (Compl. ¶¶

6  30-51.) Accordingly, the Complaint undoubtedly satisfies the pleading standard of Rule 9(b), as it

7  contains the "'who, what, when, where, and how' of the misconduct charged." *See Vess v. Ciba-*

8  *Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted).

9        The Complaint also forecloses any possibility that the Vronsky Email to Lead Investor

10  could be construed as merely stating an opinion: Mr. Vronsky himself framed the content of his

11  email to Lead Investor as a knowable fact:

12
13
14

> I wanted to give you a heads up that one of our portfolio companies, Meati, is in a pretty significant trade secret and patent dispute with a company you might be evaluating, The Better Meat Co. ***I don't know really more than that*** but as a matter of friendship and courtesy, I thought I would reach out and ***let you know***.

15  (Compl. ¶ 47.)  And while Defendants now try to restate their allegations as their opinions, the

16  Complaint alleges that Defendants themselves knew and believe the allegations to be untrue. (*Id.* ¶

17  44.) Thus, even if stated as their claimed opinions, Defendants' statements would be false.

18        As for Defendants' reliance argument, this element is reasonably inferred from the

19  Complaint's allegations that Defendants' interference frustrated BMC and the Lead Investor's

20  performance of their agreement and made performance more difficult. (*Id.* ¶¶ 60-61.)

21        Finally, Defendants' contention that BMC cannot rely on the UCL as the independently

22  wrongful act is misplaced. (Mot. at 11.) The Complaint's reference to anti-competitive conduct was

23  not intended to rely upon the UCL as the independently wrongful act underlying BMC's intentional

24  interference with prospective economic advantage claim. Rather, the phrase "anti-competitive

25  conduct" was intended to encompass anti-competitive common law torts such as slander of title and

26  trade libel.

27

28

1    Accepting the Complaint's allegations as true and drawing all reasonable inferences in

2  BMC's favor, it is more than plausible that Defendants' interference was independently wrongful.

3  Defendants' arguments to the contrary should be rejected.

4  **II.     BMC SUFFICIENTLY ALLEGED DEFENDANTS VIOLATED THE UCL**

5    The scope of California's unfair competition law is broad and sweeping. *Cel-Tech*

6  *Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999). It

7  defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or

8  practice." *Id.* "By proscribing 'any unlawful' business practice, 'section 17200 'borrows' violations

9  of other laws and treats them as unlawful practices' that the unfair competition law makes

10  independently actionable." *Id.* (citations omitted). Accordingly, where a plaintiff plausibly alleges

11  that the defendant has engaged in a business practice "that at the same time is forbidden by law,"

12  the plaintiff has also pled a plausible UCL claim. *Id.* The only other requirement to state a UCL

13  claim is that the plaintiff have standing, which encompasses "any 'person who has suffered injury

14  in fact and has lost money or property' as a result of unfair competition." *Ghazarian v. Magellan*

15  *Health, Inc.*, 53 Cal. App. 5th 171, 193 (2020) (quoting *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758,

16  788 (2010)).

17    Defendants' contention that BMC has not pled an economic injury sufficient to confer

18  standing under the UCL is baseless. (Mot. at 12.) There are innumerable ways in which a plaintiff

19  may sufficiently allege a loss of money or property sufficient to confer standing. The California

20  Supreme Court has offered a few non-exhaustive examples of an economic injury: A plaintiff may

21  "surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would

22  have"; "have a present or future property interest diminished"; or "be required to enter into a

23  transaction, costing money or property, that would otherwise have been unnecessary." *Kwikset*

24  *Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011).

25    BMC has alleged facts plausibly demonstrating all three of these examples of economic

26  injury. By alleging that Defendants' conduct negatively impacted BMC's ability to secure

27  investments on favorable terms, BMC has plausibly pled that it "acquire[d] in a transaction less"

28  than it otherwise would have. By alleging that Defendants disparaged the ownership of BMC's

16                                Case No. 2:21-CV-02338-KJM-CKD

intellectual property and core technology, BMC has plausibly pled that its "property interest" in its valuation while trying to raise capital was "diminished." *See id.* at 336 ("the economic injury that an unfair business practice occasions may often involve a loss by the plaintiff without any corresponding gain by the defendant, such as, for example, a diminishment in the value of some asset a plaintiff possesses. . . . Such injuries . . . qualify as injury in fact"). And by alleging that Defendants sent BMC and Lead Investor false statements and threatening litigation in bad faith, BMC was "required" to retain legal counsel,  bring this suit, and put an end to Defendants' anti-competitive misconduct—expensive actions that "would otherwise have been unnecessary."

To the extent that Defendants repeat their causation argument that BMC's economic injuries were not caused by Defendants because BMC would have suffered the same harms whether or not Bond and Mr. Vronsky "complied with the law" (Mot. at 12), the Court should reject this argument for the same reasons discussed above. The Complaint alleges that Mr. Vronsky and Bond caused BMC to suffer economic harm by acting in concert with Emergy to interfere with BMC's investor relationships and ability to raise capital by spreading falsities about its business. These allegations suffice to plead causation and establish standing.

On the merits of BMC's UCL claim, Defendants admit that the UCL claim survives if BMC's tortious interference claim survives. (Mot. at 12-13.) Accordingly, because BMC has stated a plausible claim for both interference with contract and interference with prospective economic advantage, BMC has also necessarily alleged the "unlawful" prong of the UCL. Defendants' Motion on this ground should be denied.

### III.   CAL. CIV. CODE § 47 DOES NOT BAR BMC'S CLAIMS BECAUSE THE COMPLAINT ALLEGES THAT DEFENDANTS ACTED IN BAD FAITH

Defendants contend that BMC's tortious interference and UCL claims are barred by the litigation privilege set forth in California Civil Code § 47(b) and the common interest privilege set forth in California Civil Code § 47(c). (Mot. at 15-18.) This argument rehashes the theories offered by Defendant Emergy and fail for reasons given in BMC's opposition to Emergy's motion to dismiss, which is incorporated by reference herein. These privileges shield communications made in good faith, and thus, do not apply here; Defendants' pre-suit tortious interference did not further

any litigation purpose and was not in good faith. At the Rule 12(b)(6) stage, the Court must accept all facts in the Complaint as true, including those allegations that Defendants Vronsky and Bond coordinated with Emergy to disrupt BMC's fundraising round and investor relationships maliciously and in bad faith. Accordingly, California Civil Code § 47 does not and cannot apply as a matter of law to protect Defendants from suit for their tortious conduct.

### A.    The Litigation Privilege Does Not Apply

Defendants Vronsky and Bond explicitly join Defendant Emergy's argument that the Vronsky Email falls within the litigation privilege. (Mot. at 16.) But for the reasons outlined in BMC's opposition to Defendant Emergy's Motion to Dismiss, the conduct alleged in the Complaint does not satisfy the requirements of the litigation privilege. (Emergy MTD Opp. at 5-15.)

The litigation privilege applies only to "communication[s] (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Strawn v. Morris, Polich & Purdy, LLP*, 30 Cal. App.5th 1087, 1095-1096 (2019) (citing *Silberg v. Anderson*, 786 P.2d 365, 368-69 (1990)). It does not apply here for two reasons:

*First*, the litigation privilege only protects communications made "in furtherance of … an official proceeding," *i.e.*, to "achieve the objects of the litigation." *Klem v. Access Ins. Co*., 17 Cal. App. 5th 595, 613 (2017). However, the Vronsky Email simply relayed the existence of Defendant Emergy's false accusations to BMC's lead investor. (Emergy MTD Opp. at 7 (citing Dkt. No. 1 ¶¶ 46-51).) It did not further any Defendant's litigation efforts by, for example, alerting the recipients about having status as a potential witness, facing potential liability, or being required to preserve evidence. (*Id.*) Instead, Defendants' efforts served only to "impair BMC's ability to raise money." (*Id.* (citing Dkt. No. 1 ¶¶ 41-51).)

*Second*, the litigation privilege "does not attach prior to the actual filing of a lawsuit unless and until litigation is seriously proposed in good faith for the purpose of resolving the dispute." (Emergy MTD Opp. at 10-11 (citing *Strawn*, 30 Cal. App.5th at 1095-1096).) BMC has alleged that Defendants had not contemplated litigation in "good faith" or "to achieve the objects of … litigation" when they sent of the Vronsky Email to BMC's lead investor. If Defendant Emergy

1   actually held a "good faith" intention to bring litigation, it could have filed suit without inventing

2   unnecessary communications or enlisting Defendants Vronsky and Bond to email the Lead

3   Investor, and BMC's investors would have learned about Defendant Emergy's allegations right

4   away. Instead, BMC alleges that Defendants sent Vronsky Email as part of a coordinated effort to

5   ensure its false allegations would reach BMC's Lead Investor without being subject to the scrutiny

6   of a court. (*Id.* at 12 (citing Dkt. No. 1 ¶¶ 4, 44, 50-51).)

7       Accepting these allegations as true, BMC has at minimum created reasonable inferences

8   that preclude application of the litigation privilege on a motion to dismiss.

9       **B.      The Common Interest Privilege Does Not Apply**

10      Defendants contend that the communications between Mr. Vronsky, Bond, and BMC's

11  Lead Investor are subject to the common-interest privilege codified in California Civil Code

12  § 47(c). (Mot. at 16-18.) They are not.

13      "Civil Code section 47, subdivision (c) codifies the common law privilege of common

14  interest, which protected communications made in good faith on a subject in which the speaker and

15  hearer shared an interest or duty." *Kashian v. Harriman*, 98 Cal. App. 4th 892, 914 (2002) (citation

16  and internal quotation marks omitted). "This privilege applied to a narrow range of private

17  interests. The interest protected was private or pecuniary; the relationship between the parties was

18  close, *e.g.*, a family, business, or organizational interest; and the request for information must have

19  been in the course of the relationship." *Id.* (citing *Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711, 723

20  (1989)). Section 47(c) "defines a privileged communication as one made without malice." *Id.* at

21  915. Accordingly, "if malice is shown, the privilege is not merely overcome; it never arises in the

22  first instance.'" *Id.* (citing *Brown.*, 48 Cal. 3d at 723 n.7). "Malice for purposes of the statute means

23  'a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure

24  another person.'" *Id.* (citing *Brown.*, 48 Cal. 3d at 723).

25      As Defendants rightfully concede, the privilege does not protect communications that are

26  made with malice or bad faith, or when the defendant lacked reasonable grounds for belief in the

27  truth of the communication. (*See* Mot. at 16-18.) That fact is fatal to Defendants' claim of privilege

28  here. The Complaint alleges that Defendants sent the December 15 Letter to BMC "falsely

claiming trade secret misappropriation and ownership of its patents that was objectively and subjectively baseless and in bad faith." (Compl. ¶ 55.) As noted above, the Complaint also alleges that Defendants Vronsky and Bond worked in concert with Emergy and as Emergy's agent to make material misrepresentations to Lead Investor in the Vronsky Email a mere **thirteen minutes** after Emergy sent its December 15 Letter to BMC. (*Id.* ¶¶ 46, 56.) Accepting these allegations as true, BMC has created a reasonable inference that Defendants acted with malice in contacting Lead Investor, thereby preventing the applicability of the common-interest privilege in the first instance.

## IV.    BMC SHOULD BE GRANTED LEAVE TO AMEND

To the extent the Court accepts any of Defendants' arguments, leave to amend should be granted. Rule 15(a)(2)'s directive that courts "should freely give leave" to amend "is 'to be applied with extreme liberality.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

## <u>CONCLUSION</u>

For the foregoing reasons, BMC respectfully requests that the Court deny Defendants' Motion to Dismiss, or in the alternative, grant BMC leave to amend the Complaint.

Dated:  April 19, 2022

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:   /s/ *Jeffrey M. Theodore*
Jeffrey M. Theodore

*Attorneys for Plaintiff*
*The Better Meat Co.*