1  Jeffrey D. Smyth (SBN 280665)
    jeffrey.smyth@finnegan.com
2  **FINNEGAN, HENDERSON, FARABOW,**
    **GARRETT & DUNNER, LLP**
3  3300 Hillview Avenue
   Palo Alto, California  94304
4  Tel: (650) 849-6600 / Fax: (650) 849-6666

5  Deanna C. Smiley (*pro hac vice*)
    Deanna.Smiley@finnegan.com
6  Taylor L. Stark (*pro hac vice*)
    Taylor.Stark@finnegan.com
7  **FINNEGAN, HENDERSON, FARABOW,**
    **GARRETT & DUNNER, LLP**
8  1875 Explorer Street, Suite 800
   Reston, VA 20190-6023
9  Tel: (571) 203-2700 / Fax: (571) 203-2777

David K. Mroz (*pro hac vice*)
 David.Mroz@finnegan.com
Luke J. McCammon (*pro hac vice*)
 Luke.McCammon@finnegan.com
John M. Williamson (*pro hac vice*)
 John.Williamson@finnegan.com
Sonja W. Sahlsten (*pro hac vice*)
 Sonja.Sahlsten@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,**
 **GARRETT & DUNNER, LLP**
901 New York Avenue, NW
Washington, DC 20001-4413
Tel: (202) 408-4000 / Fax: (202) 408-4400

10  *Attorneys for Defendant and Counterclaimant*
11  *Emergy Inc.*

12

13  **UNITED STATES DISTRICT COURT**
    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

14

15  THE BETTER MEAT CO.,                    CASE NO. 2:21−CV−02338−KJM−CKD

16          Plaintiff,                      **EMERGY, INC.'S ANSWER TO THE**
                                            **COMPLAINT; COUNTERCLAIMS**
17      v.
                                            **DEMAND FOR JURY TRIAL**
18  EMERGY, INC. d/b/a MEATI FOODS, PAUL
    VRONSKY, and BOND CAPITAL
19  MANAGEMENT LP,

20          Defendants.

21  ───────────────────────────────

22  EMERGY, INC. d/b/a MEATI FOODS,

23          Counterclaimant,

24      v.

25  THE BETTER MEAT CO. and AUGUSTUS
    PATTILLO,
26
            Counterdefendants.
27

28

Defendant Emergy, Inc. d/b/a Meati Foods ("Emergy"), by and through its counsel, answers the Complaint of Plaintiff The Better Meat Co. ("BMC") for (1) Tortious Interference, (2) Unfair Competition under Cal. Bus. & Prof. Code § 17200, and (3) Declaratory Judgment of Inventorship ("Complaint") and pleads counterclaims against BMC and Augustus Pattillo pursuant to ECF No. 108 as follows:

## ANSWER

## INTRODUCTION

1.    Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as to the utility BMC's products, and therefore denies them. Emergy denies all remaining allegations in Paragraph 1.

2.    Denied.

3.    Emergy admits that it has asserted that its co-founders, Dr. Tyler Huggins and Dr. Justin Whiteley, should be named as inventors of the patents currently and improperly assigned to BMC, and that Emergy is the proper owner of said patents. Emergy denies all remaining allegations in Paragraph 3.

4.    Denied.

5.    Emergy admits that BMC asserts claims (1)-(3) recited in Paragraphs 52-73 of the Complaint but denies that BMC is entitled to relief under these claims. To the extent any allegations in Paragraph 5 remain, Emergy denies them.

## PARTIES

6.    Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as to the corporate status of BMC and therefore denies them.

7.    Emergy admits that it is a public benefit corporation organized under the laws of Delaware with its headquarters and principal place of business in Boulder, Colorado.

8.    Emergy admits that Bond Capital Management LP ("Bond Capital") has invested in Emergy. Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 8, and therefore denies them.

9.      Paragraph 9 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy (a) denies that Mr. Vronsky's conduct is attributable to Emergy under principles of respondeat superior; and (b) lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 9, and therefore denies them.

**JURISDICTION AND VENUE**

10.     Admitted.

11.     Paragraph 11 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy (a) consents to personal jurisdiction in California for the limited purposes of this litigation only; (b) lacks knowledge or information sufficient to form a belief as to the truth of the allegations that Bond Capital and Mr. Vronsky are subject to personal jurisdiction in California, and therefore denies them; and (c) denies all remaining allegations in Paragraph 11.

12.     Paragraph 12 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy (a) lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations that Mr. Vronsky sent at least one message to Mr. Jurvetson from within California and that Mr. Jurvetson is located in California, and therefore denies them; and (b) denies all remaining allegations in Paragraph 12.

13.     Paragraph 13 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy denies all allegations in Paragraph 13.

14.     Paragraph 14 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy (a) does not challenge the propriety of venue in this District for the purposes of this litigation only; (b) lacks knowledge or information sufficient to form a belief as to the truth of the allegations that venue in this District is proper as to Bond Capital and Mr. Vronsky, and therefore denies them; and (c) denies any allegations in Paragraph 14 that may remain.

**BACKGROUND**

**A.      The Better Meat Co.**

15.     Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 15, and therefore denies them.

16.     Emergy denies that BMC's "Rhiza" mycoprotein product is novel. Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remainder of the allegations in Paragraph 16, and therefore denies them.

17.     Denied.

18.     Emergy admits that BMC filed U.S. Patent Application Nos. 16/578,099 ("the '099 Application") and 16/586,150 ("the '150 Application") in September 2019. Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 18, and therefore denies them.

19.      Emergy admits that the '099 Application issued as U.S. Patent No. 11,058,137 on July 13, 2021, and that said patent is titled "Enhanced aerobic fermentation methods for producing edible fungal mycelium blended meats and meat analogue compositions." To the extent any allegations in Paragraph 19 remain, Emergy denies them.

**B.     Emergy**

20.     Emergy admits that it was founded to develop and commercialize technologies that would solve large societal and environmental problems. Emergy denies all remaining allegations in Paragraph 20.

21.     Emergy admits that Emergy was accepted into the Chain Reaction Innovations ("CRI") program at the Department of Energy's UChicago Argonne National Laboratory ("Argonne") to develop and commercialize the use of filamentous organisms to produce a variety of valuable products. Emergy denies all remaining allegations in Paragraph 21.

22.     Denied.

23.     Emergy admits that it began operating under the name "Meati Foods" in 2019 and opened its headquarters in the spring of 2019. Emergy also admits that it explored the application of its technology in various industries. Emergy denies all remaining allegations in Paragraph 23.

24.     Emergy admits that it has obtained investment financing from Acre Venture Partners, Bond Capital, Congruent Ventures, Prelude Ventures, Tao Capital, Fifty Years, and Rose Marcario.

25.     Denied.

26.     Emergy admits that it currently has several patent applications pending before the United States Patent and Trademark Office ("USPTO") and that no patents have yet to issue on said applications as of the date of this filing. Emergy denies all remaining allegations in Paragraph 26.

27.     Denied.

28.     Emergy admits that it is producing and selling alternative meat products made from mycelium. Emergy further admits that it has obtained financing. To the extent any allegations in Paragraph 28 remain, Emergy denies them.

**C.      Emergy's Correspondence with The Better Meat Co. and Mr. Pattillo from July of 2021 to September of 2021**

29.     Denied.

30.     Emergy admits that it sent two letters on July 16, 2021: one to BMC, and one to Augustus Pattillo. Emergy denies all remaining allegations in Paragraph 30.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Emergy admits that BMC responded to Emergy's July 16, 2021 letter to BMC on August 5, 2021. Emergy denies all remaining allegations in Paragraph 34.

35.     Emergy admits that it responded to BMC's August 5, 2021 communication on August 25, 2021. Emergy denies all remaining allegations in Paragraph 35.

36.     Emergy admits that BMC responded to Emergy's August 25, 2021 communication on September 8, 2021. Emergy denies all remaining allegations in Paragraph 36.

37.     Emergy admits that it sent an email, which included an attached letter, to BMC on December 15, 2021. To the extent any allegations in Paragraph 37 remain, Emergy denies them.

**D.      The Better Meat Co.'s Series A Financing**

38.     Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegation regarding when BMC began to formally engage with potential investors in a Series A financing round, and therefore denies this allegation. Emergy denies all remaining allegations in Paragraph 38.

39. Emergy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and therefore denies them.

40. Denied.

**E.      Emergy's and Mr. Vronsky's Correspondence with The Better Meat Co., Mr. Pattillo, and Steve Jurvetson in December of 2021**

41. Emergy admits that it became aware of BMC's fundraising efforts and the identity of Mr. Jurvetson. Emergy denies all remaining allegations in Paragraph 41.

42. Emergy admits that it sent an email, which included an attached letter, to BMC at 1:51 p.m. on December 15, 2021. The letter reads, in part, as follows:

> We write on behalf of our client, Meati (f/k/a Emergy, LLC) regarding The Better Meat Co.'s and Mr. Pattillo's misappropriation of Meati's trade secrets and unfair competition, Mr. Pattillo's breach of his nondisclosure agreement with Emergy, LLC, and the incorrect inventorship of U.S. Patent No. 11,058,137 and U.S. Patent Application No. 16/586150. . . .

> Meati has tried for months to resolve this matter without formal legal action. The Better Meat Co. has not meaningfully addressed the issues raised in our letters and has not complied with the demands in those letters. Mr. Pattillo has been non-responsive. The Better Meat Co. continues to make, sell, and offer for sale its Rhiza product, which is the product of Mr. Pattillo's and The Better Meat Co.'s misappropriation and improper use of Meati's confidential information.

> Given the above, Meati has decided to move forward with legal action and will be filing a complaint against The Better Meat Co. and Mr. Pattillo in the immediate future. In this action, Meati will seek an injunction to enjoy The Better Meat Co. and Mr. Pattillo from disclosing and continuing to use Meati's trade secret and confidential information. Meati will also seek an order directing the Director of the United States Patent and Trademark Office to correct the inventorship of the patent claims that The Better Meat Co. currently has (by naming Tyler Huggins and Justin Whiteley as the rightful inventors and removing Mr. Pattillo as an inventor). Meati will also seek money damages for harm caused to it by The Better Meat Co. and Mr. Pattillo, as well as attorneys' fees.

To the extent any allegations in Paragraph 42 remain, Emergy denies them.

43.     Emergy admits that it attached to its December 15, 2021 email three appendices comprising its July 16, 2021 letters to BMC and Mr. Pattillo and its August 25, 2021 communication to BMC. Emergy denies all remaining allegations in Paragraph 43.

44.     Denied.

45.     Denied.

46.     Emergy admits that Bond Capital invests in Emergy. Emergy further admits that, on December 15, 2021, Mr. Vronsky sent an email to Mr. Jurvetson in which he stated that he had "been at BOND for a couple of years now as General Partner and GC." Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 46 and therefore denies them.

47.     Emergy admits that Mr. Vronsky's December 15, 2021 email reads as follows:

Steve,

It's been a while since we last connected when I was still with Alexander at Vy. I've been at BOND for a couple of years now as General Partner and GC. I wanted to give you a heads up that one of our portfolio companies, Meati, is in a pretty significant trade secret and patent dispute with a company you might be evaluating, The Better Meat Co. I don't know really more than that but as a matter of friendship and courtesy, I thought I would reach out and let you know. I'm happy to connect with your counsel if that is helpful. I hope you're well otherwise, been enjoying following you and your exploits on [T]witter.

Best,
Paul

48.     Denied.

49.     Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations that Mr. Vronsky is not a friend of, and has no relationship with, Mr. Jurvetson, and therefore denies them. Emergy denies all remaining allegations in Paragraph 49.

50.     Denied.

51.     Denied.

**<u>FIRST CAUSE OF ACTION</u>**
**Tortious Interference - Against All Defendants**

52.     Emergy repeats and incorporates by reference its answers to Paragraphs 1 through 51 of the Complaint.

53.     Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 53, and therefore denies them.

54.     Denied.

55.     Denied.

56.     Paragraph 56 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy (a) admits that Mr. Vronsky sent an email to Mr. Jurvetson in which Mr. Vronsky stated that he had "been at BOND for a couple of years now as General Partner and GC"; (b) lacks knowledge or information sufficient to form a belief as to whether, in sending the email, Mr. Vronsky acted as the agent and employee of Bond Capital, and therefore denies it; and (c) Emergy denies all remaining allegations in Paragraph 56.

57.     Denied.

58.     Paragraph 58 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy denies all allegations in Paragraph 58.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Paragraph 62 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy denies all allegations in Paragraph 62.

**<u>SECOND CAUSE OF ACTION</u>**
**Unfair Competition - Cal. Bus. & Prof. Code § 17200 – Against All Defendants**

63.     Emergy repeats and incorporates by reference its answers to Paragraphs 1 through 62 of the Complaint.

64.     Paragraph 64 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy denies all allegations in Paragraph 64.

65. Denied.

66. Paragraph 66 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy denies all allegations in Paragraph 66.

### THIRD CAUSE OF ACTION
### Declaratory Judgment of Inventorship – Against Emergy

67. Emergy repeats and incorporates by reference its answers to Paragraphs 1 through 66 of the Complaint.

68. Paragraph 68 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy denies all allegations in Paragraph 68.

69. Paragraph 69 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy denies all allegations in Paragraph 69.

70. Paragraph 70 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy denies all allegations in Paragraph 70.

71. Denied.

72. Emergy admits that BMC's ability to exploit, use, and license to others its intellectual property rights, including those pertaining to the subject matter disclosed and claimed in the '137 patent, depends, at least in part, on whether the inventors of said intellectual property are properly named. Emergy lacks knowledge or information sufficient to form a belief as to the truth or falsity of all remaining allegations in Paragraph 72, and therefore denies them.

73. Paragraph 73 states legal conclusions to which no answer is required. To the extent an answer is required, Emergy (a) admits that there is an immediate, real, and substantial controversy between the parties regarding whether the true inventors are properly identified in the '137 Patent; and (b) denies all remaining allegations in Paragraph 73.

### PRAYER FOR RELIEF

74. The Prayer for Relief requires no response. To the extent any response is required, Emergy denies that BMC is entitled to any relief in this action and asks that the Court deny any and all relief requested by BMC in its Complaint.

## **AFFIRMATIVE DEFENSES**

75.     Without conceding that any of the following is not already at issue by virtue of the foregoing denials, and without prejudice to Emergy's right to plead additional defenses as discovery into the facts of the matter or further investigation may warrant, Emergy asserts the following affirmative defenses:

### **Emergy's First Affirmative Defense**
### **California Litigation Privilege, Cal. Civ. Code § 47(b)**

76.     BMC's first and second causes of action are barred, in whole or in part, by the California litigation privilege, Cal. Civ. Code § 47(b).

### **Emergy's Second Affirmative Defense**
### ***Noerr-Pennington* Doctrine**

77.     BMC's first and second causes of action are barred, in whole or in part, by the *Noerr-Pennington* doctrine.

### **Emergy's Third Affirmative Defense**
### **California Anti-SLAPP Statute**

78.     BMC's first and second causes of action are barred, in whole or in part, by the California anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16 *et seq.*, and are subject to a separate motion to strike (ECF No. 31).

### **Emergy's Fourth Affirmative Defense**
### **Unlawfulness of Contract or Expectancy**

79.     BMC cannot prevail on its first and/or second causes of action because any contract or business expectancy it may have is unlawful or contrary to public policy.

### **Emergy's Fifth Affirmative Defense**
### **Justification/Privilege**

80.     To the extent that Emergy may be determined to have interfered with BMC's contractual relations or prospective economic advantage, Emergy's interference was justified because it (1) had a legally protected interest; (2) acted or threatened to protect that interest in good faith; and (3) used an appropriate means to protect that interest. BMC therefore cannot prevail on its first and/or second causes of action.

**Emergy's Sixth Affirmative Defense**
**Competition Privilege**

81.     To the extent that Emergy may be determined to have interfered with BMC's contractual relations or prospective economic advantage, Emergy's interference is protected under the privilege of competition because (1) any relationship between BMC's current and prospective investors concerns a matter involved in the competition between Emergy and BMC; (2) Emergy did not employ wrongful means; (3) Emergy's actions did not create or continue an unlawful restraint of trade; and (4) Emergy's purpose was, at least in part, to advance Emergy's interest in competing with BMC. BMC therefore cannot prevail on its first and/or second causes of action.

**Emergy's Seventh Affirmative Defense**
**"Unclean Hands" Doctrine**

82.     To the extent that Emergy may be determined to have tortiously interfered with BMC's contractual relations or prospective economic advantage or to have unfairly competed with BMC in a manner that violates Cal. Bus. & Prof. Code § 17200, BMC's misdeeds leave it with unclean hands that bar its first and/or second causes of action or, in the alternative, limit or obviate its entitlement to remedies under its first and/or second causes of action.

**Emergy's Eighth Affirmative Defense**
**Right to Free Speech**

83.      BMC's first and second causes of action are barred, in whole or in part, by the right to free speech guaranteed by the U.S. Constitution and/or the California Constitution.

**Emergy's Ninth Affirmative Defense**
**Right to Petition**

84.     BMC's first and second causes of action are barred, in whole or in part, by the right to petition for redress of grievances guaranteed by the U.S. Constitution and/or the California Constitution.

**Emergy's Tenth Affirmative Defense**
**Entitlement to Offset Damages**

85.     Emergy denies that it is liable to BMC for any amount of damages. However, in the event that Emergy is found so liable, in calculating BMC's alleged damages or any other monetary relief, Emergy is entitled to a set-off against any damages and/or other monetary harm Emergy suffered by reason of BMC's misdeeds as alleged in Emergy's Counterclaims.

**Emergy's Eleventh Affirmative Defense**
**Failure to State a Claim or Satisfy Burden of Proof**

86.     BMC has failed to adequately allege, or cannot meet its burden of proof in demonstrating, facts sufficient to justify an entitlement to relief on its first, second, and/or third causes of action.

**Emergy's Twelfth Affirmative Defense**
**Incorporation of Affirmative Defenses**

87.     Emergy hereby incorporates any and all affirmative defenses raised by Bond Capital and Mr. Vronsky.

**Emergy's Thirteenth Affirmative Defense**
**Reservation of Rights to Assert Additional Defenses**

88.     Emergy lacks sufficient knowledge or information upon which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses available to it. Emergy reserves the right to assert additional affirmative defenses in the event discovery into the facts of the matter or further investigation indicates that such defenses would be appropriate.

**GENERAL DENIAL**

Any allegation in BMC's Complaint not expressly admitted by Emergy is hereby denied. Having answered BMC's Complaint, Emergy denies that BMC is entitled to the relief requested in its Prayer for Relief or to any relief whatsoever.

1

## COUNTERCLAIMS

2       Counterclaimant Emergy Inc. (d/b/a Meati Foods) ("Emergy") brings these counterclaims

3   against Counterdefendants The Better Meat Co. ("BMC") and Augustus Pattillo ("Mr. Pattillo").

4   Emergy alleges as follows upon actual knowledge with respect to itself and its own acts and on

5   information and belief as to all other matters.

6

## PARTIES

7       1.      Counterclaimant Emergy is a public benefit corporation organized under the laws of

8   Delaware with its headquarters and principal place of business in Boulder, Colorado.

9       2.      Counterdefendant BMC is a general corporation organized under the laws of

10  Delaware with its headquarters and principal place of business in West Sacramento, California.

11      3.      Counterdefendant Augustus Pattillo is an individual last known to reside at 2316 E

12  Street, Apt. 1, Sacramento, California 95816-3529.

13

## JURISDICTION AND VENUE

14      4.      Emergy repeats and realleges each and every allegation set forth in Paragraphs 1

15  through 3 of these Counterclaims.

16      5.      For Emergy's claims under the federal Defend Trade Secrets Act (18 U.S.C. § 1836

17  *et seq*.) and federal patent law (35 U.S.C. § 256), this Court has subject matter jurisdiction pursuant

18  to 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over Emergy's other

19  claims pursuant to 28 U.S.C. § 1367 because they originate from a common nucleus of operative fact

20  underlying Emergy's federal claims. This Court also has diversity jurisdiction over Emergy's claims

21  pursuant to 28 U.S.C. § 1332 because Emergy resides in Colorado and Mr. Pattillo resides in

22  California, and the amount in controversy exceeds $75,000.

23      6.      This Court has personal jurisdiction over BMC because it has its principal place of

24  business in West Sacramento, California. BMC also has continuous and systematic contacts with the

25  State of California and has purposely directed activities at the State of California, and these claims

26  arise out of and relate to those activities. In addition, BMC's conduct, as alleged herein, occurred in

27  California.

28

7. This Court has personal jurisdiction over Mr. Pattillo because, upon information and belief, he is domiciled in Sacramento, California. Mr. Pattillo also has continuous and systematic contacts with the State of California and has purposely directed activities at the State of California, and these claims arise out of and relate to those activities. In addition, Mr. Pattillo's conduct, as alleged herein, occurred in California.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1). BMC and Mr. Pattillo are both residents of California. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to Emergy's claims occurred in this District.

## FACTUAL BACKGROUND

### A.   Emergy's Founders Create an Innovative Mycelium Treatment Process

9. Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 8 of these Counterclaims.

10. Emergy is an innovative company based in Boulder, Colorado that makes alternative meat products from mycelium. Mycelium is the vegetative part of a mushroom consisting of a mass of branching, fibrous filaments called hyphae. The fruit body of the mushroom grows above ground, and the mycelium grows in and on the ground.



11.     Mycelia originate from spores that germinate and absorb nutrients from the environment as they grow. Mycelial colonies can be too small to see, or they can be so large that they span thousands of acres of land.

12.     Emergy was formed in 2015. The co-founders of Emergy, Tyler Huggins and Justin Whiteley, were PhD students at the University of Colorado Boulder from 2012-2016. During that time, they researched the chemical and physical properties of mycelium and analyzed whether mycelium could be used as templates for carbon-based materials (i.e., battery electrodes and filters). They published several high-impact scientific journal articles and won multiple honorary awards for this work. Drs. Huggins and Whiteley subsequently applied for and earned a prestigious grant to perform additional mycelium research at the U.S. Department of Energy's UChicago Argonne National Laboratory ("Argonne") in Illinois. Drs. Huggins and Whiteley began conducting research at Argonne on January 2, 2017.

13.     Preparing mycelium for research is challenging. The physical properties of mycelium masses can vary greatly depending on how the mycelium is grown and treated by researchers. Known mycelium selection, cultivation, harvesting, and treatment processes predating the research performed by Drs. Huggins and Whiteley involved handling mycelial masses in ways that prevented the masses from acquiring desirable fibrous properties or made the masses lose their fibrous properties and become unstructured. For example, practitioners would boil cultivated mycelial masses into a slurry to extrude, causing loss of long-range texture and resulting in mushy masses.

14.     While working together at Argonne, Drs. Huggins and Whiteley discovered and developed innovative trade secret, confidential, and proprietary mycelium selection, cultivation, harvesting, and treatment processes that allowed them to *generate and preserve particular textural properties in mycelial masses*. The mycelial masses that Drs. Huggins and Whiteley produced were not mushy—they maintained their branching, fibrous filament structures. Drs. Huggins and Whiteley achieved this extraordinary result by departing from known processes, avoiding harsh treatments that could damage mycelial structures and instead focusing on less harsh methods that locked in mycelial texture.

15.     As an example, Drs. Huggins and Whiteley dewatered the mycelial masses they cultivated by "pressing" them, which allowed them to remove water from the masses until they reached a certain density. At that point, they dried the raw mycelia until it reached a desired moisture content. Through hundreds of hours of tireless experimentation with the pressing and drying steps, Drs. Huggins and Whiteley discovered that they could make mycelial masses with different densities, porosities, and firmness. For example, they could make mycelial masses ranging from soft and fluffy to hard and brittle. And within that wide spectrum of firmness properties, they could make densely packed mycelial masses with little void space, and loosely packed masses with more void space—*all while maintaining the fibrous textural properties of the mycelial masses.* Drs. Huggins and Whiteley developed trade secret, confidential, and proprietary methodologies for selecting, cultivating, harvesting, and treating mycelia that simply did not exist before, and their innovations had vast commercial potential.

16.     Drs. Huggins and Whiteley were using the fibrous, textured mycelia they were creating at Argonne primarily for research in the energy storage field. But they also realized their innovative mycelia and associated techniques could have significant commercial applications in the alternative meat space. This is because the structure and texture of their fibrous mycelial filaments resembled the strings of muscle found in animal meat. Thus, unlike earlier plant-based alternative meat companies, which focused on simulating ground meats like ground beef and used a long list of ingredients to build texture, the textured mycelium Drs. Huggins and Whiteley created resembled *whole cuts and grounds of animal meat* with a simple ingredient list. One experiment Drs. Huggins and Whiteley performed at Argonne involved making an alternative meat from their textured mycelia (by using their trade secret, confidential, and proprietary processes). The photograph below shows some of the alternative meat created during this experiment, which was marinated with fat and plant-based flavoring.



17.     During their time at Argonne, Drs. Huggins and Whiteley documented some of their experiments by, among other things, writing notes and data in a master electronic lab notebook stored in OneNote and by taking pictures of the mycelia they created. They used the notebook and photographs to track their cultivation techniques and pressing and drying parameters and to record, among other things, the textural properties (e.g., densities, porosities, and firmness) of the resulting mycelial masses. The notebook and photographs show trade secret, confidential, and proprietary information generated by hundreds of hours of experimentation, research, and development. Thus, the master electronic lab notebook and pictures described above expressly documented commercially significant trade secret, confidential, and proprietary information about the innovative mycelium harvesting processes and resulting mycelial products that Drs. Huggins and Whiteley discovered.

**B.     Mr. Pattillo Inquires About Employment and Research Opportunities with Emergy, Agrees to NDA with Emergy, Receives Confidential Information, and Applies for a Fellowship to Conduct Research for Emergy**

18.     After starting their research at Argonne, Drs. Huggins and Whiteley decided to bring on a junior lab technician intern to help them carry out their experiments under their supervision and instruction.

19.     For months, Augustus Pattillo had been seeking employment and research opportunities with Emergy. Upon information and belief, Mr. Pattillo has a Bachelor of Arts Degree

in Environmental Studies/Ecology and Evolutionary Biology from the University of Colorado Boulder.

20.     Mr. Pattillo first met Dr. Huggins in 2016 (before Drs. Huggins and Whiteley were conducting research at Argonne). In October 2016, Mr. Pattillo expressed an interest in the fungal and energy technology Dr. Huggins was working on at the time.

21.     After their first meeting, Mr. Pattillo kept in touch with Dr. Huggins. In January 2017, after learning that Emergy was conducting research at Argonne, Mr. Pattillo inquired about employment opportunities at Emergy and offered to relocate for such an opportunity.

22.     On April 7, 2017, Mr. Pattillo again contacted Dr. Huggins and asked to work for Emergy, this time offering his services for free. Mr. Pattillo said, "I would like to offer my services free of charge to you and Emergy." He further said, "I keep thinking about what you guys are doing and want to contribute."

23.     On May 3, 2017, Mr. Pattillo emailed again and offered to work with Emergy for free.

24.     At that point, Drs. Huggins and Whiteley decided to involve Mr. Pattillo in their research, and on May 3, 2017, Dr. Huggins emailed Mr. Pattillo a nondisclosure agreement ("NDA") to sign before they discussed the details of Emergy's research and development.

25.     One week later, on May 10, 2017, Mr. Pattillo completed and returned what he called the "signed non-disclosure agreement." Mr. Pattillo also changed the file name of the NDA document he signed from "Emergy Unilateral NDA" to "Signed Emergy Unilateral NDA.pdf." Mr. Pattillo also said he "look[ed] forward to contributing" and immediately asked to get up to date on Emergy's work.

Tyler,

I will contact Nicollette and meet up. Sounds very interesting. Is she doing the research under Emergy this summer or is it a collaborative but separate relationship? I have actually been reading about nanoparticle synthesis of fungi lately. There is a lot of potential there.

What do you think the best way for me to get up to date on your work is? Feel free to send anything my way via email. I am available for a call or skype as well. Attached is your signed non-disclosure agreement. My mind has been reeling on this and I look forward to contributing. I hope all is well out there.

Best,
Gus Pattillo
(678) 662 - 1398

Jokes here it is.
[Quoted text hidden]

📄 **Signed Emergy Unilateral NDA.pdf**
141K

26.     By completing, returning, and referring to the NDA as "signed," Mr. Pattillo agreed to be bound by the provisions of the NDA.

27.     The NDA is attached to these Counterclaims as Exhibit 1.

28.     The NDA defined "Confidential Information" as follows:

> "***Confidential Information***" means a [*sic*] any and all technical and non-technical information provided by EM[1] to Recipient[2] including, but not limited to, all tangible, intangible, visual, electronic, present, or future information such as: (a) patent and patent applications[;] (b) trade secrets; (c) proprietary and confidential information, including, but not limited to, ideas, techniques, sketches, drawings, works of authorship, models, inventions, know-how, processes, apparatuses, equipment, related to current, future, and proposed products and services of EM; (d) financial information, including pricing; (e) technical information, including research, development, procedures, algorithms, data, designs, and know-how; (f) business information, including operations, planning, marketing interests, and products; (g) the terms of any agreement between EM and Recipient and the discussions, negotiations and proposals related to that agreement; and (h) information which would, due to the nature of information disclosed or the circumstances surrounding disclosure, appear to a reasonable person to be confidential or proprietary.

Ex. 1, ¶ 2. In Section 3.1 of the NDA, Mr. Pattillo agreed "not to use any Confidential Information disclosed to [him] by EM for [his] own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship," to "not disclose or permit disclosure of any

---

[1] The nondisclosure agreement refers to Emergy as "EM."

[2] The nondisclosure agreement refers to Mr. Pattillo as the "Recipient."

Confidential Information to third parties or to employees of Recipient," and to "take all reasonable measures to protect the secrecy of, and avoid disclosure or use of, Confidential Information of EM in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information." *Id.*, ¶ 3.1.

29.     On May 15, 2017, five days after Mr. Pattillo completed and returned the NDA, Dr. Huggins confirmed receipt of the NDA, thanked Mr. Pattillo for the NDA, and shared Emergy confidential information with Mr. Pattillo.

30.     On May 22, 2017, Mr. Pattillo asked Dr. Huggins written questions about Emergy's cultivation and carbonization processes and requested samples of their cultures and images of their mycelia. At the same time, Mr. Pattillo expressed unfamiliarity with the specific type of filamentous fungus that Emergy was using in its research.

31.     Drs. Huggins and Whiteley subsequently shared additional confidential information with Mr. Pattillo pursuant to the NDA.

32.     On July 31, 2017, Mr. Pattillo contacted Dr. Huggins to inquire about and express interest in applying for Emergy's fellowship at Argonne through the Applied Research Experience Fellowship Program.

Tyler,

I recently encountered the Applied Research Experience Program on the Chain Reactions website and saw that Emergy holds a potential fellowship for the program. I am very interested in applying for this. Is this something you would be interested in working with me on? Applicants are suggested to work with project leads as a primary step in applying. If this is something you would want to consider, I would love to talk a bit more about the opportunity.

Best,
Gus Pattillo

33.     On August 2, 2017, Dr. Huggins agreed to write Mr. Pattillo a letter of endorsement for the fellowship position, explained that Emergy would be who selected the fellow, and clarified that the fellowship was a one-year appointment. Later that day, Mr. Pattillo submitted his resume and cover letter to Dr. Huggins and indicated that he was excited to work together.

34.     Emergy selected Mr. Pattillo for the fellowship position and formally recommended him to the U.S. Department of Energy.

35.     On August 9, 2017, Mr. Pattillo thanked Dr. Huggins for the opportunity to work with Emergy at Argonne, and, as shown below, stated that he was "very excited to start work with Emergy!"

> Tyler,
>
> Thank you for the opportunity to come out and work at Argonne. I have started making plans for Chicago. I am hoping to have the most important aspects of the move worked out by Sunday when I leave for Siberia. If it is possible to have everything worked out with the DOE by then, it would be a great help as I will most likely not have access to the internet out there.
>
> I am very excited to start work with Emergy! Let me know if there is anything you need from me.
>
> Best,
> Gus Pattillo

### C.     Mr. Pattillo Conducts Research on Behalf of and at the Instruction of Emergy and Accesses Emergy's Trade Secret and Confidential Information, Which Emergy Took Reasonable Measures to Keep Secret

36.     In or around October 2017, and about nine months after Drs. Huggins and Whiteley began conducting research at Argonne, Mr. Pattillo started as an Applied Research Experience Fellow and began conducting research on behalf of and under the direction and instruction of Emergy.

37.     In November 2017, Dr. Huggins explained that Mr. Pattillo would be working on the fungal cultivation process and stock maintenance. Mr. Pattillo, upon his own request, directly observed Emergy's trade secret, confidential, and proprietary processes and procedures for working with Emergy's cultures.

38.     Beginning in November 2017 and throughout Mr. Pattillo's time conducting research for Emergy at Argonne, Drs. Huggins and Whiteley provided Mr. Pattillo with detailed instructions on experiments and tests that Mr. Pattillo was to conduct. Dr. Huggins indicated that the data from these experiments would be important for Emergy's research and development efforts as well as grants Emergy was writing.

39.     From November 2017 to at least March 2018, Mr. Pattillo provided Drs. Huggins and Whiteley with data and results from confidential experiments and tests they asked him to conduct. Mr. Pattillo was not a professionally trained microbiologist, nor did he have any prior experience using methods of cultivating or processing mycelia like those used by Emergy. Thus, his work was

confined to being trained on how to perform Emergy's trade secret, confidential, and proprietary techniques, doing certain experiments using those techniques, and performing other tasks customary for a junior lab technician. During his time at Argonne, Mr. Pattillo participated in treatment studies, trace element analyses, and mycelium harvesting and processing for Emergy.

40.     Mr. Pattillo's research while at Argonne was done at the instruction, direction, and control of Emergy and under Emergy's supervision. At all times Mr. Pattillo knew or should have known that all Emergy research was trade secret, confidential, and proprietary.

41.     While conducting research for Emergy at Argonne, and because he agreed to Emergy's NDA and was serving as a junior lab technician intern for Emergy, Mr. Pattillo had access to Emergy's trade secret, confidential, and proprietary information of a technical and business nature.

42.     Mr. Pattillo had full access to the small laboratory room where Emergy was conducting its confidential research. With access to the laboratory, Mr. Pattillo also had access to all of Emergy's strains, growth materials, myceliaum at various stages of Emergy's selection, cultivation, harvesting, and treatment processes, and experimental samples. Emergy took measures to keep the laboratory and its contents secure and confidential. For example, the laboratory was locked and accessible only to authorized personnel with a key.

43.     Additionally, Mr. Pattillo was given access to several documents specifically in view of his agreement to abide by Emergy's NDA. Emergy also implemented a user access control system to limit access to and otherwise protect its trade secret, confidential, and proprietary materials. Emergy would only share documents that included technical and business trade secret, confidential, and proprietary information with individuals subject to a nondisclosure agreement.

44.     One of these documents was the master electronic lab notebook where Emergy maintained trade secret, confidential, and proprietary information, including inputs into and data collected from experiments. Emergy took measures to keep this master electronic lab notebook and all technical data confidential. To access this notebook, either Dr. Huggins or Dr. Whiteley had to provide electronic permissions. During their time at Argonne, access to the master electronic lab

notebook was only granted after an NDA was in place. These permissions were granted to Mr. Pattillo because he was subject to Emergy's NDA.

45.     A second such document was an Emergy proposal for a Department of Energy Small Business Innovation Research ("SBIR") Phase 1 grant that Dr. Huggins sent Mr. Pattillo on December 4, 2017, and that Emergy had recently submitted to the Department of Energy. When sharing this proposal with Mr. Pattillo, Dr. Huggins described the document as explaining "Emergy's grand vision!"

Hey Gus,

Attached is the recent DOE SBIR proposal we just sent in.  Check it out, will give you good background knowledge on Emergy's grand vision!

Cheers dude,
TH

Narrative.pdf
5170K

46.     This particular SBIR proposal included Emergy trade secrets and confidential and proprietary information of a technical and business nature. Among other things, the proposal included information on Emergy's foundational platform technology that allowed Drs. Huggins and Whiteley to create and preserve textured mycelial structures. This proposal also described properties, procedures, and parameters used in Emergy's experiments and studies, data and results from those experiments and studies, and cost and economic analyses.

47.     Emergy took several measures to protect the secrecy and confidentiality of the information in the proposal. Emergy took these same protective measures for several other SBIR proposals it submitted, which contained additional trade secrets and confidential and proprietary information.

48.     For example, Emergy included on the cover sheet of the proposal the following notice, which explained that the document contained trade secret information identified throughout by vertical lines in the side margin.

**DEPARTMENT OF ENERGY SMALL BUSINESS INNOVATION RESEARCH PHASE I**

**PROJECT TITLE:** Bio-Manufacturing of High Performance Filtration Media from Brewery Wastewater

**TOPIC: 16a**

**PRINCIPAL INVESTIGATOR**
Dr. Justin Whiteley

Emergy Labs
9700 Cass Ave.
Building 362
Lemont, IL 60439

Pages 2, 5, 6, 7, 10, 12 of this document may contain trade secrets or commercial or financial information that is privileged or confidential and is exempt from public disclosure. Such information shall be used or disclosed only for evaluation purposes or in accordance with a financial assistance or loan agreement between the submitter and the Government. The Government may use or disclose any information that is not appropriately marked or otherwise restricted, regardless of source.

Proprietary Data Legend: Lines, paragraphs, tables, charts, and other graphics containing trade secrets, commercial, and/or financial information are marked with a vertical line in the side margin | .

49.   Emergy limited disclosure of the SBIR proposal to only those individuals who, like Mr. Pattillo, were under an NDA and select members of the Department of Energy who managed the proposal review process. Notably, Emergy had an agreement with the Department of Energy whereby the Department agreed to not disclose information in the proposal that Emergy had marked as trade secrets for a period of five years. The trade secret information designated as such by Emergy in the SBIR (with the vertical lines) was still in the five-year window as of the date these Counterclaims were filed.

50.   Moreover, when Emergy submitted the proposal to the Department of Energy, it simultaneously submitted a short abstract of its work containing only non-trade secret, non-confidential, and non-proprietary information; Department of Energy officials had previously stated that only this abstract would be made publicly available. On information and belief, the Department of Energy, in accordance with its prior assurances to Emergy, has never publicly disseminated the proposal.

51.   Again, Dr. Huggins shared this proposal with Mr. Pattillo because he was subject to Emergy's NDA.

52.     A third such document was a process diagram that Dr. Whiteley sent Mr. Pattillo on January 3, 2018. This process diagram included trade secret, confidential, and proprietary information on the technical details and parameters that Emergy used to create its textured mycelial masses, including, but not limited to, the equipment, times, temperatures, and inputs used at each step of Emergy's selection, cultivation, harvesting, and treatment processes. Emergy did not share this process diagram with anyone not subject to a nondisclosure agreement.

53.     Moreover, in his role as a junior lab technician intern, Mr. Pattillo saw vast amounts of information that could be gleaned from the results of Emergy's experimentation. While Drs. Huggins and Whiteley enjoyed substantial successes as they developed Emergy's innovative textured mycelial platform and procedures at Argonne, they also learned much and continuously made adjustments in light of their failures. Notably, Drs. Huggins and Whiteley made important discoveries about what selection and cultivation techniques did not work and what experimental parameters had little to no impact on fungal growth while they were at Argonne. Drs. Huggins and Whiteley also studied various fungal strains and found that some were better than others for the particular research they were doing. Mr. Pattillo knew about and was involved in many of these experiments, and he gained just as much—if not more—insight into Emergy's trade secret, confidential, and proprietary textured mycelial platform and procedures from his understanding of what did not work or had little impact as he did from his understanding of what did work or had a substantial impact.

54.     In sum, Mr. Pattillo had access to substantial amounts of Emergy's trade secret, confidential, and proprietary information, including information on Emergy's innovative selection; cultivation; harvesting; and pressing, drying, and other treatment techniques that Emergy used to produce its textured mycelia (e.g., inputs, methodologies, raw data, results, conclusions, methodological adjustments). Drs. Huggins and Whiteley shared this information with Mr. Pattillo because of the NDA that required him to limit the use of, maintain the confidentiality of, and not disclose Emergy's trade secret, confidential, and proprietary information.

**D.      Mr. Pattillo Learns of the Food and Alternative Meat Applications of Emergy's Research**

55.      As mentioned, while at Argonne, Drs. Huggins and Whiteley knew their textured mycelia innovation had potential applications in the alternative meat field. For example, in January 2018, Emergy explicitly identified "edible protein" as a product of their proprietary technology in a presentation it developed to seek partnerships with breweries, as shown in the slide below.

Company Overview:

- Early-Stage technology company developing a process to simultaneously treat food and beverage (F&B) processing wastewater and produce high value byproduct

- Proprietary industrial biotechnology to convert waste biogenic carbon into materials, chemical, and edible protein

- Pilot and validating at Argonne National Lab in Chicago IL

56.      And at least by March 2018, Emergy was actively investigating the use of its textured mycelia specifically as a meat alternative.

57.      Mr. Pattillo was well aware of and involved in the protein, food, and alternative meat applications of Emergy's platform. Indeed, Drs. Huggins and Whiteley had conveyed to Mr. Pattillo (under the NDA) their belief that their innovative processes and textured mycelia had applications in the food and alternative meat fields.

58.      For example, on December 11, 2017, Dr. Huggins sent Mr. Pattillo an Emergy "Business Roadmap" presentation showing food as a potential business application for its textured mycelia technology.

59.      Next, in February 2018, with the approval of Drs. Huggins and Whiteley, Mr. Pattillo requested to take a trip abroad in April 2018 to meet with Marlow Foods (a.k.a. Quorn Foods), which is a fungal biomass food producer. Emergy approved of the trip, as it believed it would assist Emergy's efforts given the focus of their technology on alternative meat applications. Mr. Pattillo requested approval and funding for the trip from the Advanced Manufacturing Office of the Department of Energy. In that request, Mr. Pattillo explained that he planned to go to Middlesbrough

in the United Kingdom to meet with the fermentation specialist of Quorn Foods, that it would be incredibly valuable to see Quorn Foods' operations, and that the meeting could lead to potential partnerships. Mr. Pattillo went on the trip and visited with Quorn Foods, which gave him a tour of its manufacturing facility and fermentation systems. Notably, Quorn Foods did not produce *textured* mycelia like that enabled by Emergy's trade secret, confidential, and proprietary processes. Rather, Quorn boiled mycelia before extruding them in accordance with known production processes, resulting in loss of mycelial structure and fibrosity, as described above.

60.     By no later than April 30, 2018, Emergy was making food-grade fungal biomass-based alternative meat, a sample of which is shown below, at the lab at Argonne. Mr. Pattillo was aware of and involved in this alternative meat application, frequently discussed it with Drs. Huggins and Whiteley, and even tasted the alternative meat pictured below.



**E.     Mr. Pattillo Abruptly Ends His Research Position and Leaves Emergy**

61.     As Emergy began to explore food and meat alternative applications for its textured mycelial platform, Mr. Pattillo became more interested in becoming a part owner of Emergy.

62.     On May 5, 2018, Mr. Pattillo asked Drs. Huggins and Whiteley to make him a co-founder and 1/3 shareholder of Emergy. Drs. Huggins and Whiteley told Mr. Pattillo that they were not interested in him becoming a co-founder or 1/3 shareholder because they did not believe he brought substantive value to the company beyond his duties as a junior lab technician intern. However, Drs. Huggins and Whiteley did offer Mr. Pattillo a full-time position and a competitive

1    equity package. Mr. Pattillo declined, quit his research fellowship, and left Argonne that same day.

2    Mr. Pattillo's guest research appointment was officially terminated on May 7, 2018.

3    **F.**     **Mr. Pattillo Joins The Better Meat Co. and Operates in "Stealth-Mode"**
             **for Three Years Before Launching a Directly Competing Product Using**
4            **Emergy's Trade Secret, Confidential, and Proprietary Technology and**
             **Improperly Claiming It as Their Own**
5

6    63.     On current information and belief (but not known to Emergy at the time), Mr. Pattillo

7    joined BMC as Chief Technology Officer ("CTO") and co-founder in May of 2018—the same

8    month he abruptly stopped conducting research for Emergy.

9    64.     When Mr. Pattillo joined BMC, the company's Chief Executive Officer ("CEO") was

10   Paul Shapiro. Mr. Shapiro obtained a Bachelor of Arts Degree in Peace Studies and Conflict

11   Resolution from The George Washington University and had spent the previous thirteen years at the

12   Humane Society of the United States in Washington, D.C.

13   65.     After teaming up at BMC, on current information and belief (but not known to

14   Emergy at the time), Mr. Shapiro and Mr. Pattillo began working on an alternative meat product

15   *using the same type of textured mycelia* and processes that Drs. Huggins and Whiteley were using at

16   Argonne.

17   66.     Upon information and belief, Mr. Pattillo disclosed Emergy's inventions, trade

18   secrets, and confidential and proprietary information to BMC. Upon information and belief, BMC

19   filed at least one provisional patent application, U.S. Provisional Patent Application No. 62/733,925

20   ("the '925 application), on September 20, 2018—just four months after Mr. Pattillo stopped working

21   as a junior lab technician intern for Emergy. Upon information and belief, using the same

22   information, BMC additionally filed at least three patent applications from September 20, 2019 to

23   September 27, 2019: U.S. Patent Application Nos. 16/578,099 ("the '099 application") and

24   16/586,150 ("the '150 application") and PCT Application No. PCT/US2019/052236 ("the '236

25   application"). Each of these applications claimed priority to the '925 application, included Emergy's

26   trade secret, confidential, and proprietary information, and incorrectly listed Mr. Pattillo as the sole

27   inventor. Notably, Mr. Pattillo sought and was granted Track One examination for the

28   '099 application, which meant that the application would be reviewed in an expedited manner by the

U.S. Patent and Trademark Office ("USPTO"). Through an illicit assignment executed by Mr. Pattillo, Mr. Shapiro, and BMC on February 18, 2020, Mr. Pattillo assigned the '925 application, the '099 application, the '150 application, and the '236 application to BMC.

67.    The '099, '150, and '236 applications published on March 26, 2020 as US20200093167, US20200093155, and WO2020061502, respectively.

68.    On September 20, 2019, BMC entered the '236 application into the national phase in both China and Europe. The China National Intellectual Property Administration ("CNIPA") accorded the Chinese national phase application Application No. 201980076214.8 ("the '214.8 application"). The '214.8 application published on June 29, 2021 as CN113056202. The European Patent Office ("EPO") accorded the European national phase application Application No. 19782852.8 ("the '852.8 application"). The '852.8 application published on July 28, 2021 as EP3852543.

69.    On July 9, 2021, BMC filed another patent application, U.S. Patent Application No. 17/371,745 ("the '745 application"), which claimed priority to BMC's earlier applications and published on January 6, 2022 as US20220000159.

70.    On December 23, 2021, BMC filed two more patent applications, U.S. Patent Application Nos. 17/561,312 ("the '312 application") and 17/561,322 ("the '322 application"), which also claimed priority to BMC's earlier applications and published on April 21, 2022 as US20220117282 and US20220117276, respectively.

71.    On May 9, 2022, BMC filed yet another patent application, U.S. Patent Application No. 17/739,725 ("the '725 application"), which again claimed priority to BMC's earlier applications and published on October 20, 2022 as US20220330593.

72.    Through their efforts to acquire the above patents, BMC and Mr. Pattillo not only used Emergy's trade secret, confidential, and proprietary information for their own gain, but also caused the public disclosure of said information through the publication of the '099 application, the '150 application, and the '236 application on March 26, 2020; the '214.8 application on June 29, 2021; the '852.8 application on July 28, 2021; the '745 application on January 6, 2022; the '312

application and the '322 application on April 21, 2022; and the '725 application on October 20, 2022.

73.     On June 8, 2021, BMC announced the completion of a mycoprotein fermentation facility in Sacramento and unveiled a new product called "Rhiza," touting its whole-cut meat applications. Around the time of the launch, Mr. Shapiro and Mr. Pattillo revealed that BMC had been operating "in stealth mode" for three years on this mycoprotein fermentation facility and their "Rhiza" product.



Paul Shapiro: "We've been in stealth mode for three years on this project ..." Pic credit: Elaine Watson

Elaine Watson, *Introducing Rhiza: The Better Meat Co Completes Construction of "Substantial" Mycoprotein Production Facility in Sacramento*, Food Navigator-USA.com (June 8, 2021), https://www.foodnavigator-usa.com/Article/2021/06/08/Introducing-Rhiza-The-Better-Meat-Co-completes-construction-of-substantial-mycoprotein-production-facility-in-Sacramento.



Gus Pattillo, LinkedIn, https://www.linkedin.com/posts/activity-6808851274436485120-Du_Y/.

74. It was around this time in June 2021 that Drs. Huggins and Whiteley first learned that Mr. Pattillo had stolen their trade secret, confidential, and proprietary textured mycelial innovation (and the processes used to create it), and that Mr. Pattillo had used this information to create a competing product at BMC.

75. Then, on July 13, 2021, the '099 application issued as U.S. Patent No. 11,058,137 ("the '137 patent"), with Mr. Pattillo named as the sole inventor. The face of the '137 patent shows it was illicitly assigned to BMC. The '137 patent is attached to these Counterclaims as Exhibit 2.

76.     Three more patents have issued to BMC since that time: the '322 application issued as U.S. Patent No. 11,432,574 ("the '574 patent") on September 6, 2022; the '150 application issued as U.S. Patent No. 11,470,871 ("the '871 patent") on October 18, 2022; and the '312 application issued as U.S. Patent No. 11,478,006 ("the '006 patent") on October 25, 2022. As with the '137 patent, the face of each patent identifies Mr. Pattillo as the sole inventor and evidences an illicit assignment to BMC. These three patents are attached to these Counterclaims as Exhibits 3 through 5.

77.     The '137 patent, the '574 patent, the '871 patent, and the '006 patent cover the same mycelium selection, cultivation, harvesting, and treatment methods and mycelium-based food products that Mr. Pattillo learned from Drs. Huggins and Whiteley during his time conducting research for Emergy. Indeed, the specifications and claims of the patents describe specific trade secret, confidential, and proprietary information from Drs. Huggins's and Whiteley's master electronic lab notebook documenting their research at Argonne.

78.     For example, the '137 patent contains subject matter derived directly from Emergy and information that was trade secret, confidential, and proprietary at the time of Mr. Pattillo's and BMC's misappropriation. This is illustrated in the table below, which compares certain disclosures and claims in the '137 patent to information in Emergy's confidential documents and materials created before Mr. Pattillo left for BMC. The overlap shown in the table between the subject matter disclosed and claimed in the '137 patent and the information in Emergy's confidential documents and materials—*which extended down to the property ranges of materials in some instances*—is alarming.

| Disclosure/Claim in the '137 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|
| **Claim 1**<br>A shelf-stable protein food ingredient comprising:<br>filamentous fungal particles from the genus *Neurospora* with a mean particle size between about 5 mm and about 20 mm or between about 5 mm and about 50 mm, said filamentous fungal particles consisting essentially of: | By no later than August 7, 2017, Emergy developed a shelf-stable food ingredient comprising filamentous fungal particles from the genus *Neurospora* with particle sizes between 5 mm and about 20 mm or between about 5 mm and about 50 mm, as shown below and documented in its master electronic lab notebook. |

| Disclosure/Claim in the '137 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|
| |  |
| a) cultured filamentous fungal biomass from the genus *Neurospora* in an amount at least about 94-96% w/w; and | Emergy's filamentous fungal particles were made from cultured filamentous fungal biomass from the genus *Neurospora* in an amount of at least about 94-96% w/w, as documented in its master electronic lab notebook. |
| b) water in an amount of about 4% to about 6% w/w. | By no later than October 23, 2018, Emergy had conducted experiments that demonstrated that the filamentous fungal particles had a water amount in the range of about 4-6% w/w, as documented in its master electronic lab notebook. |
| **Claim 6**<br>6. A food ingredient composition comprising one or more plant ingredients and the shelf-stable protein food ingredient of claim 1. | By no later than September 1, 2017, Emergy had developed a food ingredient composition with the shelf-stable protein food ingredient of claim 1 and with plant ingredients incorporated.<br><br> |

| Disclosure/Claim in the '137 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|
| |  |
| **Claim 7**<br>7. A food product comprising the shelf-stable protein food ingredient of claim 1, further comprising:<br>(a) one or more meat ingredients;<br>(b) one or more plant ingredients; or<br>(c) both one or more meat ingredients and one or more plant ingredients. | By no later than September 1, 2017, Emergy had developed a food product comprising the shelf-stable protein food ingredient of claim 1 and with plant ingredients incorporated.<br><br> |
| **Claim 13**<br>13. A method for producing a shelf-stable food ingredient comprising the steps of:<br><br>a) culturing a filamentous fungi from the genus *Neurospora* in a liquid growth medium to produce a filamentous fungal biomass slurry comprising about 0.5-8% biomass; wherein the liquid growth medium comprises 10-30 g/l sucrose or glucose, 2.0-5.0 g/l $KH_2PO_4$, 0.5-2.0 g/l $NH_4NO_3$, 0.2 g/l $MgSO_4$, 1 g/l $CaSO_4$, 0.005 g/l $Zn\ SO_4$, 0.001 g/l $Fe(NH_4)^2(SO_4)^2$, 0.00025 g/l $CuSO_4$, 0.0001 g/l $MnSO_4$, and 0.0025 g/l biotin; | Emergy developed a method for producing a shelf-stable food ingredient comprising the following steps:<br><br>a) By no later than March 4, 2018, Emergy had cultured filamentous fungi from the genus *Neurospora* in a liquid growth medium with the recited composition to produce a filamentous fungal biomass slurry of about 0.5-8% biomass. |

| Disclosure/Claim in the '137 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|
| |  |
| b) harvesting the filamentous fungal biomass and dewatering the filamentous fungal biomass to produce a harvested filamentous fungal biomass comprising about 60-85% water and about 15-40% filamentous fungal biomass; | b) By no later than July 5, 2017, Emergy had harvested and dewatered filamentous fungal biomass to produce a filamentous fungal biomass with about 60-85% water and about 15-40% filamentous fungal biomass, as shown in Emergy's master electronic lab notebook.  Mr. Pattillo was aware of and involved in performing the harvesting and dewatering steps of Emergy's processes, as documented in Emergy's master electronic lab notebook.

11/16-11/17
Thursday, November 16, 2017      9:47 AM

☑ Sample all 4 Large Reactors, AM(SK, PR, BBR, RBR)
☑ De-water and dry biomass, dilute samples for digestion
☐ Prepare Glass Bio-reactor 1 (GBR1)

(Red check box by "De-water and dry biomass" entry completed by Mr. Pattillo). |
| c) pressing the harvested filamentous fungal biomass to produce a filamentous fungal biomass slab; | c) By no later than May 15, 2017, Emergy had pressed and shaped harvested filamentous fungal biomass to produce slabs. |

| Disclosure/Claim in the '137 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|
| |  Mr. Pattillo was aware of and involved in performing this step of Emergy's processes, as documented in Emergy's master electronic lab notebook.  (Red check box by "Press patties of biomass" entry completed by Mr. Pattillo). |
| d) shredding and sizing the filamentous fungal biomass slab to form filamentous particles with a mean particle size between about 5 mm and about 20 mm or between about 5 mm and about 50 mm; and | d) By no later than May 15, 2017, Emergy had shredded and sized filamentous fungal biomass slabs into particles of this size, as shown below and as documented in its master electronic lab notebook.  |
| e) drying the particles at about 50° C. to about 85° C. to form the shelf-stable food ingredient. | e) By no later than August of 2017, Emergy was conducting this "[d]rying" step, as shown |

| Disclosure/Claim in the '137 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|
| | below and as documented in its master electronic lab notebook as "70C 1 air convection oven."  |
| **Claim 17** <br><br> 17. The method of claim 13, wherein one or more of the liquid growth medium components are derived from fruit pulp, grain processing, distillation byproducts, <u>brewing byproducts</u>, corn stillage, potato processing waste, potato blanche water, rice processing waste, wheat straw, dairy whey, coffee processing waste, soda manufacturing waste, molasses, sugarcane bagasse, vinasse, cassava processing waste, or any combination thereof. (Emphasis added). | By no later than April 28, 2017, Emergy was using brewery waste as nutrients for fungal biomass production. <br><br> Emergy conducted several experiments in March of 2018 wherein one of the liquid growth medium components was derived from brewing byproducts, as documented in its master electronic lab notebook. The objective of one of these experiments was to test the effect of adding fines to fungal culture media. In this experiment, fines were taken from the end of the mash runoff collected from a brewery. The objective of another experiment was to test the effect of adding yeast to fungal culture media. In this experiment, live yeast was taken from yeast collected from a brewery. <br><br> Mr. Pattillo was involved in performing these experiments. |
| **Specification 11:17-20** <br> "In certain embodiments, the growth medium comprises <u>spent malted barley</u>." (Emphasis added). | As discussed above and as documented in its master electronic lab notebook, Emergy conducted several experiments in March of |

| Disclosure/Claim in the '137 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|
| | 2018 that used brewing byproducts as part of the growth medium. In one experiment, fines were taken from the end of the mash runoff collected from a brewery. Mash runoff is spent malted barley.<br><br>Mr. Pattillo was involved in performing this experiment. |
| **Specification 10:7-31**<br>"In some embodiments, the growth medium comprises one or more plant substrates selected from pea fiber, other plant fibers, gum arabic, natural flavors, texturized pea protein, texturized wheat protein, texturized soy protein, soy protein, wheat starch, wheat protein, pea protein, spices, safflower oil, sunflower oil, olive oil, other oils, oat bran, oat flour, legumes, beans, lentils, lentil powder, bean powder, pea powder, yeast extract, nutritional yeast (immobilized dried yeast), molasses, honey, cane sugar, mushroom powder, white button mushroom powder, shiitake mushroom powder, chickpeas, bamboo fiber, cellulose, isolated oat product, isolated pea product, pea protein, rice protein, fermented rice extract, corn starch, potato starch, kombu extract, algae, potato protein, albumin, pectin, silicone dioxide, food starch, mixed tocopherols (vitamin E), coconut oil, sunflower oil, safflower oil, rapeseed oil, canola oil, dextrose, vegetable glycerin, dried yeast, citrus extract, citrus fiber, beet pulp, beet juice, beet juice extract, turmeric, mushroom extract, shiitake mushroom stems, shiitake mushrooms, white button mushrooms, tofu, soy fiber, soy hydrolysate, yeast extract, seaweed, <u>malted barley</u>, malt extract, yeast extract, <u>whole cell yeast</u>, lentils, black beans, pinto beans, beans, legumes, and any combination thereof. In preferred embodiments, the plant biomass is potato or corn stillage." (Emphases added). | As discussed above and as documented in its master electronic lab notebook, Emergy conducted several experiments in March of 2018 that used brewing byproducts as part of the growth medium. In one experiment, live yeast was taken from yeast collected from a brewery. In another experiment, fines were obtained from the end of the mash runoff collected from a brewery. Mash runoff is spent malted barley.<br><br>Mr. Pattillo was involved in performing these experiments. |

79. The '574 patent, the '871 patent, and the '006 patent, which all share a patent specification with the '137 patent and have very similar claims, also contain subject matter derived directly from Emergy's trade secret, confidential, and proprietary information. Again, the disturbing amount of overlap between the disclosures and claims in each patent and the information in Emergy's trade secret, confidential, and proprietary documents and materials is illustrated in the table provided below.

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| **Claim 1**<br>1. A method of producing a meat analogue food product from a filamentous fungal mycelium, wherein the method comprises: | **Claim 1**<br>1. A method of producing a meat analogue food product from a filamentous fungal mycelium, wherein the method comprises: | **Claim 1**<br>1. A method of producing a meat analogue food product from a filamentous fungal mycelium, wherein the method comprises: | Emergy developed a method for producing a meat analog food product from a filamentous fungal mycelium comprising the following steps: |
| a) culturing a filamentous fungi from the genus *Neurospora* in a liquid growth medium to produce a filamentous fungal biomass slurry comprising about 0.5-8% biomass; | a) culturing a filamentous fungi from the genus Neurospora in a liquid growth medium to produce a filamentous fungal biomass slurry comprising about 0.5-8% biomass; | a) culturing a filamentous fungi from the genus *Neurospora* in a liquid growth medium to produce a filamentous fungal biomass slurry comprising about 0.5-8% biomass; | a) By no later than March 4, 2018, Emergy had cultured filamentous fungi from the genus *Neurospora* in a liquid growth medium to produce a filamentous fungal biomass slurry comprising about 0.5-8% biomass.<br><br> |
| b) harvesting the filamentous fungal biomass slurry and dewatering the filamentous | b) harvesting the filamentous fungal biomass slurry and dewatering the filamentous | b) harvesting the filamentous fungal biomass slurry and dewatering the filamentous | b) By no later than July 5, 2017, Emergy had harvested and dewatered filamentous fungal biomass to produce a filamentous fungal biomass with about 60-85% water and about 15-40% |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| fungal biomass slurry to produce a harvested filamentous fungal biomass comprising about 60-85% water and about 15-40% filamentous fungal biomass; | fungal biomass slurry to produce a harvested filamentous fungal biomass comprising about 60-85% water and about 15-40% filamentous fungal biomass; | fungal biomass slurry to produce a harvested filamentous fungal biomass comprising about 60-85% water and about 15-40% filamentous fungal biomass; | filamentous fungal biomass, as shown in Emergy's master electronic lab notebook.  Mr. Pattillo was aware of and involved in performing the harvesting and dewatering steps of Emergy's processes, as shown in Emergy's master electronic lab notebook. 11/16-11/17 Thursday, November 16, 2017    9:47 AM ☑ Sample all 4 Large Reactors, AM(SK, PR, BBR, RBR) ☑ De-water and dry biomass, dilute samples for digestion ☐ Prepare Glass Bio-reactor 1 (GBR1) (Red check box by "De-water and dry biomass" entry completed by Mr. Pattillo.) |
| c) dewatering the harvested filamentous fungal biomass to produce a filamentous | c) pressing the harvested filamentous fungal biomass to produce a filamentous | c) pressing the harvested filamentous fungal biomass to produce a filamentous | c) By no later than May 15, 2017, Emergy had pressed and shaped harvested filamentous fungal biomass to produce cakes or slabs. |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| fungal biomass cake; | fungal biomass slab; | fungal biomass slab; | 

Mr. Pattillo was aware of and involved in performing this step of Emergy's processes, as documented in Emergy's master electronic lab notebook.



(Red check box by "Press patties of biomass" entry completed by Mr. Pattillo). |
| d) producing filamentous particles from the filamentous fungal biomass cake and drying | d) shredding the filamentous fungal biomass slab to form filamentous particles and | d) shredding the filamentous fungal biomass slab to form filamentous particles and | d/e) By no later than May 15, 2017, Emergy had shredded and sized filamentous fungal biomass cakes or slabs into particles of this size, as shown below and as documented in its master electronic lab notebook. |

41

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| the filamentous particles;<br><br>e) sizing the dried filamentous particles to comprise a mean particle size between about 5 mm and about 50 mm or between 5 mm and about 20 mm; and | drying the filamentous particles;<br><br>e) sizing the dried filamentous particles to comprise a mean particle size between about 5 mm and about 50 mm to produce sized dried filamentous particles; and | drying the filamentous particles;<br><br>e) sizing the dried filamentous particles to comprise a mean particle size between about 5 mm and about 20 mm or between about 5 mm and about 50 mm to produce sized dried filamentous particles; and | By no later than August of 2017, Emergy was "[d]rying" such sized filamentous particles, as shown below and as documented in its master electronic lab notebook as "70C 1 air convection oven."<br><br> |
| f) hydrating the sized dried filamentous particles to about 30% to about 70% water | f) hydrating the sized dried filamentous particles to between about 30% to about | f) hydrating the sized filamentous particles to about 30% to about 70% water content to form | f) By no later than July 6, 2017, Emergy had "soak[ed]" samples of dried filamentous fungi in water to within the specified water content range, as documented in Emergy's master electronic lab notebook. In addition, by no later than February |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| content to form the meat analogue food product. | 70% water content to form the meat analogue product. | the meat analogue food product. | 27, 2018, Emergy was investigating methodologies for rehydrating pre-dried mycelia that existed in the prior art. |
| **Claim 2** 2. The method of claim 1, comprising drying the filamentous particles to about 4% to about 10% water, or to about 4% to about 6% water, drying the filamentous particles at about 50° C. to about 100° C. or both. | | | By no later than August of 2017, Emergy was conducting this "[d]rying" step, as shown below and as documented in its master electronic lab notebook as "70C 1 air convection oven."  |
| | **Claim 3** 3. The method of claim 1, wherein the liquid growth medium comprises 10-30 g/l sucrose or glucose, 2.0-5.0 g/l $KH_2PO_4$, 0.5-2.0 g/l $NH_4NO_3$, 0.2 g/l $MgSO_4$, 1 g/l $CaSO_4$, 0.005 g/l Zn $SO_4$ [*sic*], 0.001 g/l $Fe(NH_4)^2(SO_4)^2$ [*sic*], 0.00025 g/l CuSO4 [*sic*], 0.0001 g/l $MnSO_4$, and 0.0025 g/l biotin. | **Claim 3** 3. The method of claim 1, wherein the liquid growth medium comprises 10-30 g/l sucrose or glucose, 2.0-5.0 g/l $KH_2PO_4$, 0.5-2.0 g/l $NH_4NO_3$, 0.2 g/l $MgSO_4$, 1 g/l $CaSO_4$, 0.005 g/l Zn $SO_4$ [*sic*], 0.001 g/l $Fe(NH_4)^2(SO_4)^2$ [*sic*], 0.00025 g/l CuSO4 [*sic*], 0.0001 g/l $MnSO_4$, and 0.0025 g/l biotin. | By no later than March 4, 2018, Emergy had cultivated filamentous fungi from the genus *Neurospora* in a liquid growth medium with the recited composition to produce a filamentous fungal biomass slurry comprising about 0.5-8% biomass.  |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| **Claim 8**<br>8. The method of claim 1, further comprising combining the meat analogue food product with plant ingredients, combining the meat analogue food product with one or more natural flavorings, or both, wherein the one or more natural flavorings comprises a natural chicken flavoring, a natural beef flavoring, or a natural pork flavoring. | **Claim 13**<br>13. The method of claim 1, further comprising combining the meat analogue food product with plant ingredients. | **Claim 12**<br>12. The method of claim 1, further comprising combining the meat analogue food product with plant ingredients. | By no later than September 1, 2017, Emergy had combined a food product comprising the shelf-stable protein food ingredient of claim 1 with plant ingredients.<br> |
| **Claim 10**<br>10. The method of claim 1, wherein the liquid growth medium components are derived from ***brewing byproducts***, brewing spent grains, fruit pulp, grain processing distillation | **Claim 7**<br>7. The method of claim 1, wherein one or more of the liquid growth medium components are derived from fruit pulp, grain processing, distillation byproducts, ***brewing*** | **Claim 7**<br>7. The method of claim 1, wherein one or more of the liquid growth medium components are derived from fruit pulp, grain processing, distillation byproducts, ***brewing*** | By no later than April 28, 2017, Emergy was using brewery waste as nutrients for fungal biomass production. |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| byproducts, distillation spent grains, corn stillage, potato processing waste, potato blanch water, rice processing waste, soda manufacturing waste, molasses, sugarcane bagasse, vinasse, cassava processing waste, or any combination thereof. (Emphasis added.) | *byproducts*, corn stillage, potato processing waste, potato balance water, rice processing waste, wheat straw, dairy whey, coffee processing waste, soda manufacturing waste, molasses, sugarcane bagasse, vinasse, cassava processing waste, or any combination thereof. (Emphasis added.) | *byproducts*, corn stillage, potato processing waste, potato blanche water, rice processing waste, wheat straw, dairy whey, coffee processing waste, soda manufacturing waste, molasses, sugarcane bagasse, vinasse, cassava processing waste, or any combination thereof. (Emphasis added.) |  Emergy conducted several experiments in March of 2018 wherein one of the liquid growth medium components was derived from brewing byproducts, as documented in its master electronic lab notebook. The objective of one of these experiments was to test the effect of adding fines to fungal culture media. In this experiment, fines were taken from the end of the mash runoff collected from a brewery. The objective of another experiment was to test the effect of adding yeast to fungal culture media. In this experiment, live yeast was taken from yeast collected from a brewery. Mr. Pattillo was involved in performing these experiments. |
| **Claim 11** 11. The method of claim 10, wherein one or more of the liquid growth medium components are derived from brewing byproducts or brewing spent grains. | | | As discussed above and as documented in its master electronic lab notebook, Emergy conducted several experiments in March of 2018 that used brewing byproducts as part of its growth medium. Mr. Pattillo was involved in performing these experiments. |

| Claim 13 | | Claim 16 | |
|---|---|---|---|
| 13. A method of producing a meat analogue food product from a filamentous fungal mycelium, wherein the method comprises: | | 16. A method of producing a meat analogue food product from a filamentous fungal mycelium, wherein the method comprises: | Emergy developed a method for producing a meat analog food product from a filamentous fungal mycelium comprising the following steps: |
| a) providing a shelf-stable protein food ingredient comprising: filamentous fungal particles from the genus *Neurospora* with a mean particle size between about 5 mm and about 50 mm, said filamentous fungal particles consisting essentially of cultured filamentous fungal biomass from the genus *Neurospora* in an amount of at least about 94-96% w/w; and water in an amount of about 4% to about 6% w/w/; and | | a) providing a shelf-stable protein food ingredient comprising: filamentous fungal particles from the genus *Neurospora* with a mean particle size between about 5 mm and about 20 mm or between about 5 mm and about 50 mm, said filamentous fungal particles consisting essentially of cultured filamentous fungal biomass from the genus *Neurospora* in an amount of at least about 94-96% w/w; and water in an amount of about 4% to about 6% w/w; and | a) By no later than August 7, 2017, Emergy developed a shelf-stable protein food product comprising filamentous fungal particles from the genus *Neurospora* with particle sizes between about 5 mm and about 20 mm or between about 5 mm and about 50 mm, as shown below and documented in its master electronic lab notebook.  |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| | | | <br><br>Emergy's filamentous fungal particles were made from cultured filamentous fungal biomass from the genus *Neurospora* in an amount of at least about 94-96% w/w, as documented in its master electronic lab notebook.<br><br>By no later than October 23, 2018, Emergy had conducted experiments that demonstrated that the filamentous fungal particles had a water amount in the range of about 4-6% w/w, as documented in its master electronic lab notebook. |
| b) hydrating the shelf-stable protein food ingredient to between about 30% to 70% water content to form the meat analogue product. | | b) hydrating the a [*sic*] shelf-stable protein food ingredient to between about 30% to 70% water content to form the meat analogue food product. | b) By no later than July 6, 2017, Emergy had "soak[ed]" samples of dried filamentous fungi in water to within the specified water content range, as documented in Emergy's master electronic lab notebook. In addition, by no later than February 27, 2018, Emergy was investigating methodologies for rehydrating pre-dried mycelia that existed in the prior art. |
| **Claim 19**<br>19. The method of claim 13, further | | **Claim 22**<br>The method of claim 16, further comprising | By no later than September 1, 2017, Emergy had combined a food product comprising the shelf-stable |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| comprising combining the meat analogue food product with plant ingredients, one or more natural flavorings, or both, wherein the one or more natural flavorings is a natural chicken flavoring, a natural beef flavoring, or a natural pork flavoring. | | combining the meat analogue food product with plant ingredients. | protein food ingredient of claim 1 with plant ingredients.  |
| **Specification 11:19-20** "In certain embodiments, the growth medium comprises <u>spent malted barley</u>." (Emphasis added). | **Specification 11:14-15** "In certain embodiments, the growth medium comprises <u>spent malted barley</u>." (Emphasis added). | **Specification 11:14-15** "In certain embodiments, the growth medium comprises <u>spent malted barley</u>." (Emphasis added). | As discussed above and as documented in its master electronic lab notebook, Emergy conducted several experiments in March of 2018 that used brewing byproducts as part of the growth medium. In one experiment, fines were taken from the end of the mash runoff collected from a brewery. Mash runoff is spent malted barley.<br><br>Mr. Pattillo was involved in performing this experiment. |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| **Specification 10:10-33** "In some embodiments, the growth medium comprises one or more plant substrates selected from pea fiber, other plant fibers, gum arabic, natural flavors, texturized pea protein, texturized wheat protein, texturized soy protein, soy protein, wheat starch, wheat protein, pea protein, spices, safflower oil, sunflower oil, olive oil, other oils, oat bran, oat flour, legumes, beans, lentils, lentil powder, bean powder, pea powder, yeast extract, nutritional yeast (immobilized dried yeast), molasses, honey, cane sugar, mushroom powder, white button mushroom powder, shiitake mushroom powder, chickpeas, bamboo fiber, | **Specification 10:5-28** "In some embodiments, the growth medium comprises one or more plant substrates selected from pea fiber, other plant fibers, gum arabic, natural flavors, texturized pea protein, texturized wheat protein, texturized soy protein, soy protein, wheat starch, wheat protein, pea protein, spices, safflower oil, sunflower oil, olive oil, other oils, oat bran, oat flour, legumes, beans, lentils, lentil powder, bean powder, pea powder, yeast extract, nutritional yeast (immobilized dried yeast), molasses, honey, cane sugar, mushroom powder, white button mushroom powder, shiitake mushroom powder, chickpeas, bamboo fiber, | **Specification 10:5-28** "In some embodiments, the growth medium comprises one or more plant substrates selected from pea fiber, other plant fibers, gum arabic, natural flavors, texturized pea protein, texturized wheat protein, texturized soy protein, soy protein, wheat starch, wheat protein, pea protein, spices, safflower oil, sunflower oil, olive oil, other oils, oat bran, oat flour, legumes, beans, lentils, lentil powder, bean powder, pea powder, yeast extract, nutritional yeast (immobilized dried yeast), molasses, honey, cane sugar, mushroom powder, white button mushroom powder, shiitake mushroom powder, chickpeas, bamboo fiber, | As discussed above and as documented in its master electronic lab notebook, Emergy conducted several experiments in March of 2018 that used brewing byproducts as part of the growth medium. In one experiment, live yeast was taken from yeast collected from a brewery. In another experiment, fines were obtained from the end of the mash runoff collected from a brewery. Mash runoff is spent malted barley.<br><br>Mr. Pattillo was involved in performing these experiments. |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| cellulose, isolated oat product, isolated pea product, pea protein, rice protein, fermented rice extract, corn starch, potato starch, kombu extract, algae, potato protein, albumin, pectin, silicone dioxide, food starch, mixed tocopherols (vitamin E), coconut oil, sunflower oil, safflower oil, rapeseed oil, canola oil, dextrose, vegetable glycerin, dried yeast, citrus extract, citrus fiber, beet pulp, beet juice, beet juice extract, turmeric, mushroom extract, shiitake mushroom stems, shiitake mushrooms, white button mushrooms, tofu, soy fiber, soy hydrolysate, yeast extract, seaweed, <u>malted barley</u>, malt extract, yeast | cellulose, isolated oat product, isolated pea product, pea protein, rice protein, fermented rice extract, corn starch, potato starch, kombu extract, algae, potato protein, albumin, pectin, silicone dioxide, food starch, mixed tocopherols (vitamin E), coconut oil, sunflower oil, safflower oil, rapeseed oil, canola oil, dextrose, vegetable glycerin, dried yeast, citrus extract, citrus fiber, beet pulp, beet juice, beet juice extract, turmeric, mushroom extract, shiitake mushroom stems, shiitake mushrooms, white button mushrooms, tofu, soy fiber, soy hydrolysate, yeast extract, seaweed, <u>malted barley</u>, malt extract, yeast | cellulose, isolated oat product, isolated pea product, pea protein, rice protein, fermented rice extract, corn starch, potato starch, kombu extract, algae, potato protein, albumin, pectin, silicone dioxide, food starch, mixed tocopherols (vitamin E), coconut oil, sunflower oil, safflower oil, rapeseed oil, canola oil, dextrose, vegetable glycerin, dried yeast, citrus extract, citrus fiber, beet pulp, beet juice, beet juice extract, turmeric, mushroom extract, shiitake mushroom stems, shiitake mushrooms, white button mushrooms, tofu, soy fiber, soy hydrolysate, yeast extract, seaweed, <u>malted barley</u>, malt extract, yeast | |

| Disclosure/Claim in the '574 Patent | Disclosure/Claim in the '871 Patent | Disclosure/Claim in the '006 Patent | Select Evidence of Emergy's Research, Development, and Conception of that Subject Matter |
|---|---|---|---|
| extract, <u>whole cell yeast</u>, lentils, black beans, pinto beans, beans, legumes, and any combination thereof. In preferred embodiments, the plant biomass is potato or corn stillage." (Emphases added). | extract, <u>whole cell yeast</u>, lentils, black beans, pinto beans, beans, legumes, and any combination thereof. In preferred embodiments, the plant biomass is potato or corn stillage." (Emphases added). | extract, <u>whole cell yeast</u>, lentils, black beans, pinto beans, beans, legumes, and any combination thereof. In preferred embodiments, the plant biomass is potato or corn stillage." (Emphases added). | |

80.     BMC has claimed that its "Rhiza" product practices the inventions disclosed in each of the '137 patent, the '574 patent, the '871 patent, and the '006 patent. *See* Ex. 6 at 2 (stating that BMC's process for making "Rhiza" is "[p]rotected by U.S. Patent No. 11,058,137"); Megan Poinski, *The Better Meat Co. Patents Mycelium It Says 'Does an Even Better Job of Mimicking' Meat*, FoodDive (Oct. 25, 2022), https://www.fooddive.com/news/better-meat-co-mycelium-ingredient-patent-alternative-protein/634716/ ("Mycelium protein maker The Better Meat Co. just received its fourth patent for Rhiza, its unique shelf-stable ingredient made from a fungus species known as Neurospora crassa.").

81.     As of the date of this filing, the '745 application and the '725 application are pending before the USPTO and have not yet issued. Further, as of the date of this filing, the '236 application's life cycle as a PCT application has ended, and on information and belief the '214.8 application in China and the '852.8 application in Europe are currently pending and have not issued as foreign patents. Based on the overlapping subject matter of the provisional patent application, the PCT patent application, and the eight nonprovisional patent applications in this family, Emergy anticipates that if any patent issues on the '745 application, the '725 application, the '214.8 application, or the '852.8 application the claims of said patent will be directed to subject matter

derived from Emergy. Each of the four pending applications contains information that was trade secret, confidential, and proprietary at the time of BMC's and Mr. Pattillo's misappropriation.

**G.   The Better Meat Co.'s and Mr. Pattillo's Actions Have Unjustly Benefitted The Better Meat Co. and Mr. Pattillo and Have Harmed Emergy**

82.    Based on the Emergy trade secrets and confidential and proprietary information known to Mr. Pattillo, the timing of Mr. Pattillo's tenure as a researcher for Emergy and his start date as the CTO of BMC, and the timing of BMC's announcement of its mycoprotein fermentation facility in Sacramento and "Rhiza" product, Emergy first suspected around June of 2021 that Mr. Pattillo breached his NDA and that BMC and Mr. Pattillo used Emergy's trade secrets and confidential and proprietary information without authorization in connection with the development of BMC's Sacramento facility and the development and manufacture of BMC's "Rhiza" product.

83.    On information and belief, BMC and Mr. Pattillo were able to launch a fully operational mycoprotein fermentation facility in Sacramento and the "Rhiza" product in an unreasonably short period of time (likely with low development costs) because they stole Emergy's trade secret, confidential, and proprietary information. It took BMC only three years from the time the company launched to enter the market with a product ("Rhiza") that competed with Emergy's meat alternative products. It took Emergy much longer than that to discover its innovative mycelial texture-preserving processes and to refine them to generate a meat alternative product. With its unfair head start, obtained by stealing Emergy's trade secrets and confidential and proprietary information, BMC launched its company, opened its Sacramento facility, and began marketing its "Rhiza" product in an amount of time that otherwise would have been impossible to achieve.

84.    This unfair head start came from at least two sources encompassed within Emergy's trade secret, confidential, and proprietary information: the *know-how* achieved through the identification of equipment, parameters, and methods that produced successful or desirable properties or results; and the *negative know-how* obtained through the identification of equipment, parameters, and methods that did not. In essence, by stealing Emergy's trade secret, confidential, and proprietary information, BMC and Mr. Pattillo not only acquired the means by which they could generate a successful product in an impossibly low fraction of the time it would otherwise take, but

also avoided each and every one of the pitfalls Drs. Huggins and Whiteley encountered and surmounted through hundreds of hours of rigorous experimentation and innovation.

85.     And in all likelihood, without the benefit of Emergy's trade secrets and confidential and proprietary information, BMC and Mr. Pattillo would not have been able to launch BMC, its Sacramento facility, or its "Rhiza" product at all. On information and belief, no one had ever discovered how to make textured mycelial masses resembling animal meat before Drs. Huggins and Whiteley. Mr. Pattillo, Mr. Shapiro, and BMC would not have been able to do this either had they not stolen Drs. Huggins's and Whiteley's innovative trade secret, confidential, and proprietary information.

86.     On information and belief, BMC has attempted and continues to attempt to raise financing based on its acquisition of the '137 patent, the '574 patent, the '871 patent, and the '006 patent and the technology BMC and Mr. Pattillo misappropriated from Emergy.

87.     On information and belief, Mr. Pattillo and/or BMC have disclosed Emergy's trade secret, confidential, and proprietary information to foreign nationals and/or foreign investors, including Lever VC.

88.     Additionally, BMC has sought out and entered into agreements to market "Rhiza" to consumers. *See, e.g.*, Megan Poinski, *Hormel Partners with The Better Meat Co. to Develop Meat Analog Products*, FoodDive (Oct. 6, 2021), https://www.fooddive.com/news/hormel-partners-with-the-better-meat-co-to-develop-meat-analog-products/607653/.

89.     Because of BMC's and Mr. Pattillo's misappropriation of Emergy's trade secret, confidential, and proprietary information, Emergy has been harmed. First, Emergy has an illegitimate direct competitor in the alternative meat market that should never have existed. Emergy has to compete with this illicit business for sales, investors, talent, and advertising space. Second, because Mr. Pattillo revealed Emergy's trade secret, confidential, and proprietary information in at least nine published patent applications (four of which have issued as patents) and other advertising and media sources, other competitors besides BMC now have access to this information and can get their own head start at competing with Emergy.

**H.     Emergy Notifies The Better Meat Co. and Mr. Pattillo of Their Wrongful Actions**

90.     Counsel for Emergy sent correspondence to Mr. Pattillo and Mr. Shapiro of BMC raising its concerns about BMC's and Mr. Pattillo's conduct on July 16, 2021.

91.     Mr. Pattillo never replied to Emergy's correspondence.

92.     BMC's response on August 5, 2021 showed that it either did not know the relevant facts or was intentionally ignoring them. For example, BMC falsely asserted that Mr. Pattillo never worked for Emergy at all—that he was only conducting independent research at Argonne and had never worked under the direction of Drs. Huggins and Whiteley. This exalts form over substance and ignores the history of Mr. Pattillo repeatedly seeking employment and research opportunities with Emergy, his application to be an Applied Research Experience Fellow specifically to conduct research for Emergy, and the reality that his work at Argonne was done on behalf of and under the direction and instruction of Emergy. *See supra* ¶¶ 18-54. BMC also argued that Emergy changed its focus to animal-free meat alternatives long after Mr. Pattillo left Argonne and that Mr. Pattillo never worked on animal-free meat alternatives or anything relating to food during his time at Argonne. These arguments are plainly contradicted by the facts set forth above in Paragraphs 55 through 60, which are supported by contemporaneous documentary evidence.

93.     On August 25, 2021, counsel for Emergy sent a reply letter back to counsel for BMC showing that Emergy's allegations were supported by numerous emails, photographs, lab notebooks, and other documents. In this letter, Emergy also included a chart showing how certain disclosures and claims of the '137 patent aligned with information and data in Emergy documents and materials created by Drs. Huggins and Whiteley that *Mr. Pattillo could access and even input data into* (similar to the chart shown above in Paragraph 78).

94.     BMC's response on September 8, 2021 did not meaningfully address the factual allegations in Emergy's second letter or the chart. Instead, BMC continued to insist that Emergy was not working on any alterative meat-related applications during Mr. Pattillo's time as a researcher at Argonne. BMC also argued that there was extensive material in the public domain related to

1    cultivating members of the *Neurospora* mycelial genus for food long before Emergy and BMC

2    entered this space.

3         95.    There is no dispute that people have long been using mycelia as a food source. And to

4    the extent others had previously attempted to cultivate and use mycelia for food applications, as

5    discussed above in Paragraph 13, prior techniques involved boiling mycelial masses and then

6    extruding them, which would cause them to lose their fibrous muscle-like texture and become

7    unstructured (i.e., mushy). However, as explained above in Paragraphs 14 through 16, Drs. Huggins

8    and Whiteley discovered innovative mycelial selection, cultivation, harvesting, and treatment

9    processes that allowed them to *generate and preserve desirable structural and textural properties in*

10   *mycelial masses*.

11        96.    At this point, Emergy realized that BMC was unwilling to work with Emergy to

12   resolve this dispute outside of court. On information and belief, BMC has continued making its

13   "Rhiza" product and attempting to raise money using the trade secret, confidential, and proprietary

14   information it misappropriated from Emergy. Thus, Emergy decided litigation was necessary. On

15   December 15, 2021, Emergy's counsel sent a courtesy letter to counsel for BMC and Mr. Pattillo

16   informing them of its intent to file a lawsuit. BMC responded by filing the Complaint two days later,

17   on December 17, 2021.

18                                   **CLAIMS FOR RELIEF**

19                                        **COUNT 1**
         **Trade Secret Misappropriation – Defend Trade Secrets Act – All Defendants**
20                              **(18 U.S.C. § 1836 *et seq.*)**

21        97.    Emergy repeats and realleges each and every allegation set forth in Paragraphs 1

22   through 96 of these Counterclaims.

23        98.    Emergy owns and possesses certain trade secret, confidential, and proprietary

24   information, including, but not limited to, know-how, negative know-how, and other information

25   about its mycelium selection, cultivation, harvesting, and treatment processes, data from its

26   experiments, and business and strategic plans. This information was and is neither publicly known

27   nor readily ascertainable.

28

99.      Among the trade secrets that Emergy currently has and previously had are its innovative processes for selecting, cultivating, harvesting, and treating mycelium, which include processes for dewatering raw mycelium (e.g., using pressing or vacuuming techniques) to arrive at mycelial masses of certain densities and drying the masses to arrive at a desired moisture content. Through hundreds of hours of research, development, and trial-and-error processes, Drs. Huggins and Whiteley discovered that, using these trade secret processes, they could make mycelia with different densities, porosities, and firmness. For example, they could make mycelial masses ranging from soft and fluffy to hard and brittle. And within that wide spectrum of firmness properties, they could make densely packed mycelial masses with little void space and loosely packed masses with more void space—*all while maintaining the fibrous textural properties of the mycelial masses.* Drs. Huggins and Whiteley developed a matrix of opportunities for using mycelium that did not exist before, and it had vast commercial potential. The processes, materials, product properties and property ranges, and lab equipment that Drs. Huggins and Whiteley used to create their innovative textured mycelial masses constituted trade secret information (and still may constitute trade secret information to the extent Mr. Pattillo did not disclose it or Emergy did not disclose it publicly in a patent application or otherwise). Certain data (e.g., selection, cultivation, harvesting, and treatment techniques and parameters; data on pressing techniques and drying techniques; and data on mycelial densities, porosities, and firmness) relating to the mycelial masses that Drs. Huggins and Whiteley created and the preparation and study thereof also constituted trade secret information (and still may constitute trade secret information to the extent Mr. Pattillo did not disclose it or Emergy did not disclose it publicly in a patent application or otherwise).

100.      Emergy's trade secrets also included negative know-how, such as data and conclusions regarding processes, materials, experimental parameters, and laboratory equipment that produced undesirable results or were ineffective at producing desirable results. This negative know-how included, but was not limited to, what fungal strains did not work well, what cultivation techniques did not work and what experimental parameters had little to no impact on fungal growth, and what processes and parameters failed to lock the mycelia into the desired texture and structure. This negative know-how was achieved only through hundreds of hours of research, development,

and trial-and-error-based experimentation. Additionally, this negative know-how carried significant value to the extent that anyone privy to it could save significant time, labor, and financial resources when attempting to develop their own textured mycelial products.

101.    Emergy took and continues to take reasonable steps to guard the secrecy of its trade secret information, both at Argonne and afterwards. For example, the SBIR proposal described above in Paragraphs 45 to 51 included Emergy trade secret, confidential, and proprietary information of a technical and business nature. Among other things, the document, which was provided to Mr. Pattillo under the NDA, included trade secret, confidential, and proprietary information showing how Drs. Huggins and Whiteley were able to create mycelia with preserved structures and textures. This document also described properties, procedures, and parameters from Emergy's experiments and studies, data and results from those experiments and studies, and cost and economic analyses. Emergy took several measures to protect the confidentiality and secrecy of the information provided in the SBIR proposal. For example, the cover sheet of the SBIR proposal included a notice that the document contained trade secret information, which was indicated throughout the document by vertical lines in the side margin.

102.    Emergy also limited the disclosure of the SBIR proposal to only those who, like Mr. Pattillo, were under an NDA and a select few members of the Department of Energy who managed the proposal review process. Notably, Emergy had an agreement with the Department of Energy whereby the Department could not disclose information marked as trade secrets for a period of five years. The trade secret information designated as such by Emergy in the SBIR proposal (with the vertical lines) was still in the five-year window as of the date these Counterclaims were filed. Additionally, Emergy prepared and submitted a short abstract of its SBIR proposal that contained only non-trade secret, non-confidential, and non-proprietary information after having been informed by Department of Energy officials that only this abstract would be made publicly available. Emergy took the same protective measures described above for several other SBIR proposals, which contained additional trade secret information, and which Mr. Pattillo had access to.

103.    Further, Emergy had a company practice of restricting access to its trade secret information. It required anyone who had such access to first sign confidentiality agreements. It also

1   protected and locked its physical laboratory space and only allowed access to approved users with

2   keys. And Drs. Huggins and Whiteley restricted access to their master electronic lab notebook, and

3   only those to whom they granted electronic permission could open it. During their time at Argonne,

4   only people operating under an NDA were granted access to this notebook.

5         104.    Emergy derives independent economic value from its trade secret, confidential, and

6   proprietary information, both actual and potential, from its not being generally known to other

7   persons or businesses who could obtain economic value from its disclosure or use.

8         105.    The '137 patent, the '574 patent, the '871 patent, the '006 patent, the '925

9   application, the '236 application, the '745 application, the '725 application, the '214.8 application,

10   and the '852.8 application, which are improperly assigned to BMC and improperly list Mr. Pattillo

11   as the sole inventor, each contain information that Emergy maintained as trade secret information

12   before it was wrongfully disclosed to the public. Emergy took reasonable steps to guard the secrecy

13   of that trade secret information. The information was not known or readily ascertainable by others.

14   Emergy derived independent economic value from the information over competitors who did not

15   know or use it.

16         106.    Mr. Pattillo misappropriated Emergy's trade secret information by disclosing it to and

17   using it for BMC without Emergy's permission. At the time of Mr. Pattillo's disclosure and use of

18   Emergy's trade secret information, he knew or at least had reason to know that he had acquired

19   Emergy's trade secret information under an NDA and other circumstances that required Mr. Pattillo

20   to maintain its secrecy and limit its use. On information and belief, Mr. Pattillo used Emergy's trade

21   secret information to help build a mycoprotein fermentation facility in Sacramento, to make the

22   competing "Rhiza" product, to build a competing business, and to wrongfully file patent applications

23   and obtain patents based on Emergy's trade secrets.

24         107.    BMC misappropriated Emergy's trade secret information by acquiring it from Mr.

25   Pattillo despite having knowledge or at least reason to know that Mr. Pattillo stole trade secret,

26   confidential, and proprietary information from Emergy and provided it to BMC without Emergy's

27   permission.

28

108.     BMC misappropriated Emergy's trade secret information by using it without Emergy's permission despite having acquired it through improper means. Specifically, at the time BMC used the information, it knew or had reason to know that Mr. Pattillo had acquired it under an NDA and other circumstances giving rise to a duty to maintain its secrecy and limit its use. On information and belief, BMC solicited Emergy's trade secret information from Mr. Pattillo and used it to build BMC's mycoprotein fermentation facility in Sacramento, to make its competing "Rhiza" product, and to build its competing business.

109.     BMC and Mr. Pattillo further misappropriated Emergy's trade secret information by wrongfully disclosing it to the general public by filing patent applications that would eventually be published or issue as patents. BMC and Mr. Pattillo did so despite knowing or at least having reason to know that Mr. Pattillo acquired that information under an NDA and other circumstances giving rise to a duty to maintain its secrecy and limit its use.

110.     Notably, Emergy has filed patent applications describing certain aspects of its mycelium selection, cultivation, harvesting, and treatment processes. Emergy did not disclose *every aspect* of these processes in its patent applications, however—it wanted to keep some aspects of its processes trade secret. Mr. Pattillo and BMC caused some of these undisclosed trade secrets to go public by describing them in ten separate patent applications, nine of which have since published and four of which have since issued as patents. But for the publication of these applications and patents, certain trade secret information that Drs. Huggins and Whiteley chose not to include in their own patent applications would still be secret, Emergy would still take reasonable steps to guard the secrecy of that information, and that information would still give Emergy independent economic value over competitors who did not know or use it.

111.     On information and belief, Mr. Pattillo's and BMC's misappropriation continues to the present day.

112.     Mr. Pattillo's and BMC's actions were and are malicious and willful and have substantially harmed Emergy.

113.     As a direct and proximate result of Mr. Pattillo's and BMC's current and continued misappropriation of Emergy's trade secrets, Emergy has suffered and will continue to suffer imminent and irreparable harm.

114.     As a direct and proximate result of Mr. Pattillo's and BMC's current and continued misappropriation of Emergy's trade secrets, Emergy has suffered damages, and Mr. Pattillo and BMC have been unjustly enriched.

### COUNT 2
**Trade Secret Misappropriation – California Uniform Trade Secret Act – All Defendants**
**(Ca. Civ. Code § 3426 *et seq.*)**

115.     Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 114 of these Counterclaims.

116.     The Better Meat Co. and Mr. Pattillo are "Persons" under Cal. Civ. Code § 3426.1(c).

117.     Emergy owns and possesses certain trade secret, confidential, and proprietary information, including, but not limited to, know-how, negative know-how, and other information about its mycelium selection, cultivation, harvesting, and treatment processes, data from its experiments, and business and strategic plans. This information was and is neither publicly known nor readily ascertainable.

118.     Among the trade secrets that Emergy currently has and previously had are its innovative processes for selecting, cultivating, harvesting, and treating mycelium, which include processes for dewatering raw mycelium (e.g., using pressing or vacuuming techniques) to arrive at mycelial masses of certain densities and drying the masses to arrive at a desired moisture content. Through hundreds of hours of research, development, and trial-and-error processes, Drs. Huggins and Whiteley discovered that, using these trade secret processes, they could make mycelia with different densities, porosities, and firmness. For example, they could make mycelial masses ranging from soft and fluffy to hard and brittle. And within that wide spectrum of firmness properties, they could make densely packed mycelial masses with little void space and loosely packed masses with more void space—*all while maintaining the fibrous textural properties of the mycelial masses.* Drs. Huggins and Whiteley developed a matrix of opportunities for using mycelium that did not exist before, and it had vast commercial potential. The processes, materials, product properties and

1   property ranges, and lab equipment that Drs. Huggins and Whiteley used to create their innovative

2   textured mycelial masses constituted trade secret information (and still may constitute trade secret

3   information to the extent Mr. Pattillo did not disclose it or Emergy did not disclose it publicly in a

4   patent application or otherwise). Certain data (e.g., selection, cultivation, harvesting, and treatment

5   techniques and parameters; data on pressing techniques and drying techniques; and data on mycelial

6   densities, porosities, and firmness) relating to the mycelial masses that Drs. Huggins and Whiteley

7   created and the preparation and study thereof also constituted trade secret information (and still may

8   constitute trade secret information to the extent Mr. Pattillo did not disclose it or Emergy did not

9   disclose it publicly in a patent application or otherwise).

10       119.    Emergy's trade secrets also included negative know-how, such as data and

11   conclusions regarding processes, materials, experimental parameters, and laboratory equipment that

12   produced undesirable results or were ineffective at producing desirable results. This negative know-

13   how included, but was not limited to, what fungal strains did not work well, what cultivation

14   techniques did not work and what experimental parameters had little to no impact on fungal growth,

15   and what processes and parameters failed to lock the mycelia into the desired texture and structure.

16   This negative know-how was achieved only through hundreds of hours of research, development,

17   and trial-and-error-based experimentation. Additionally, this negative know-how carried significant

18   value to the extent that anyone privy to it could save significant time, labor, and financial resources

19   when attempting to develop their own textured mycelial products.

20       120.    Emergy took and continues to take reasonable steps to guard the secrecy of its trade

21   secret information, both at Argonne and afterwards. For example, the SBIR proposal described

22   above in Paragraphs 45 to 51 included Emergy trade secret, confidential, and proprietary information

23   of a technical and business nature. Among other things, the document, which was provided to Mr.

24   Pattillo under the NDA, included trade secret, confidential, and proprietary information showing

25   how Drs. Huggins and Whiteley were able to create mycelia with preserved structures and textures.

26   This document also described properties, procedures, and parameters from Emergy's experiments

27   and studies, data and results from those experiments and studies, and cost and economic analyses.

28   Emergy took several measures to protect the confidentiality and secrecy of the information provided

in the SBIR proposal. For example, the cover sheet of the SBIR proposal included a notice that the document contained trade secret information, which was indicated throughout the document by vertical lines in the side margin.

121.   Emergy also limited the disclosure of the SBIR proposal to only those who, like Mr. Pattillo, were under an NDA and a select few members of the Department of Energy who managed the proposal review process. Notably, Emergy had an agreement with the Department of Energy whereby the Department could not disclose information marked as trade secrets for a period of five years. The trade secret information designated as such by Emergy in the SBIR proposal (with the vertical lines) was still in the five-year window as of the date these Counterclaims were filed. Additionally, Emergy prepared and submitted a short abstract of its SBIR proposal that contained only non-trade secret, non-confidential, and non-proprietary information after having been informed by Department of Energy officials that only this abstract would be made publicly available. Emergy took the same protective measures described above for several other SBIR proposals, which contained additional trade secret information, and which Mr. Pattillo had access to.

122.   Further, Emergy had a company practice of restricting access to its trade secret information. It required anyone who had such access to first sign confidentiality agreements. It also protected and locked its physical laboratory space and only allowed access to approved users with keys. And Drs. Huggins and Whiteley restricted access to their master electronic lab notebook, and only those to whom they granted electronic permission could open it. During their time at Argonne, only people operating under an NDA were granted access to this notebook.

123.   Emergy derives independent economic value from its trade secret, confidential, and proprietary information, both actual and potential, from its not being generally known to other persons or businesses who could obtain economic value from its disclosure or use.

124.   The '137 patent, the '574 patent, the '871 patent, the '006 patent, the '925 application, the '236 application, the '745 application, the '725 application, the '214.8 application, and the '852.8 application, which are improperly assigned to BMC and improperly list Mr. Pattillo as the sole inventor, each contain information that Emergy maintained as trade secret information before it was wrongfully disclosed to the public. Emergy took reasonable steps to guard the secrecy

of that trade secret information. The information was not known or readily ascertainable by others. Emergy derived independent economic value from the information over competitors who did not know or use it.

125.    Mr. Pattillo misappropriated Emergy's trade secret information by disclosing it to and using it for BMC without Emergy's permission. At the time of Mr. Pattillo's disclosure and use of Emergy's trade secret information, he knew or at least had reason to know that he had acquired Emergy's trade secret information under an NDA and other circumstances that required Mr. Pattillo to maintain its secrecy and limit its use. On information and belief, Mr. Pattillo used Emergy's trade secret information to help build a mycoprotein fermentation facility in Sacramento, to make the competing "Rhiza" product, to build a competing business, and to wrongfully file patent applications and obtain patents based on Emergy's trade secrets.

126.    BMC misappropriated Emergy's trade secret information by acquiring it from Mr. Pattillo despite having knowledge or at least reason to know that Mr. Pattillo stole trade secret, confidential, and proprietary information from Emergy and provided it to BMC without Emergy's permission.

127.    BMC misappropriated Emergy's trade secret information by using it without Emergy's permission despite having acquired it through improper means. Specifically, at the time BMC used the information, it knew or had reason to know that Mr. Pattillo had acquired it under an NDA and other circumstances giving rise to a duty to maintain its secrecy and limit its use. On information and belief, BMC solicited Emergy's trade secret information from Mr. Pattillo and used it to build BMC's mycoprotein fermentation facility in Sacramento, to make its competing "Rhiza" product, and to build its competing business.

128.    BMC and Mr. Pattillo further misappropriated Emergy's trade secret information by wrongfully disclosing it to the general public by filing patent applications that would eventually be published or issue as patents. BMC and Mr. Pattillo did so despite knowing or at least having reason to know that Mr. Pattillo acquired that information under an NDA and other circumstances giving rise to a duty to maintain its secrecy and limit its use.

129.     Notably, Emergy has filed patent applications describing certain aspects of its mycelium selection, cultivation, harvesting, and treatment processes. Emergy did not disclose *every aspect* of these processes in its patent applications, however—it wanted to keep some aspects of its processes trade secret. Mr. Pattillo and BMC caused some of these undisclosed trade secrets to go public by describing them in ten separate patent applications, nine of which have since published and four of which have since issued as patents. But for the publication of these applications and patents, certain trade secret information that Drs. Huggins and Whiteley chose not to include in their own patent applications would still be secret, Emergy would still take reasonable steps to guard the secrecy of that information, and that information would still give Emergy independent economic value over competitors who did not know or use it.

130.     On information and belief, Mr. Pattillo's and BMC's misappropriation continues to the present day.

131.     Mr. Pattillo's and BMC's actions were and are malicious and willful and have substantially harmed Emergy.

132.     As a direct and proximate result of Mr. Pattillo's and BMC's current and continued misappropriation of Emergy's trade secrets, Emergy has suffered and will continue to suffer imminent and irreparable harm.

133.     As a direct and proximate result of Mr. Pattillo's and BMC's current and continued misappropriation of Emergy's trade secrets, Emergy has suffered damages, and Mr. Pattillo and BMC have been unjustly enriched.

## COUNT 3
### Correction of Inventorship of U.S. Patent No. 11,058,137 – All Defendants
### (35 U.S.C. § 256)

134.     Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 133 of these Counterclaims.

135.     Mr. Pattillo is listed as the sole inventor of the '137 patent.

136.     Drs. Huggins and Whiteley are the exclusive, true, and correct inventors of the '137 patent.

137.    Drs. Huggins and Whiteley together developed, conceived of, and invented the subject matter of the '137 patent. Exemplary evidence of Drs. Huggins's and Whiteley's conception, development, and invention of certain claims of the '137 patent is shown in the table included in Paragraph 78 above.

138.    Mr. Pattillo did not contribute as an inventor to any of the claims of the '137 patent. However, Mr. Pattillo was aware of Drs. Huggins's and Whiteley's inventions because—while working under an NDA—Mr. Pattillo had access to Drs. Huggins's and Whiteley's lab at Argonne; the trade secret, confidential, and proprietary processes and tests that Drs. Huggins and Whiteley directed and performed in that lab; the trade secret, confidential, and proprietary data, results, and conclusions generated from the experiments performed in that lab; and the trade secret, confidential, and proprietary master electronic laboratory notebook and other documents and materials he was provided (and the inventions recorded therein). Mr. Pattillo also conducted experiments covering trade secret, confidential, and proprietary techniques that Drs. Huggins and Whiteley had invented (under the guidance and direction of Drs. Huggins and Whiteley).

139.    Drs. Huggins and Whiteley were improperly omitted as the inventors of the '137 patent. Mr. Pattillo was improperly included as an inventor of the '137 patent.

140.    In the alternative, and at a minimum, Drs. Huggins and Whiteley were improperly omitted as co-inventors of the '137 patent.

141.    This Court may order correction of the '137 patent on notice and hearing of all parties concerned, and the Director shall issue a certificate accordingly. *See* 35 U.S.C. § 256.

<u>**COUNT 4**</u>
**Correction of Inventorship of U.S. Patent No. 11,432,574 – All Defendants**
**(35 U.S.C. § 256)**

142.    Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 141 of these Counterclaims.

143.    Mr. Pattillo is listed as the sole inventor of the '574 patent.

144.    Drs. Huggins and Whiteley are the exclusive, true, and correct inventors of the '574 patent.

145.     Drs. Huggins and Whiteley together developed, conceived of, and invented the subject matter of the '574 patent. Exemplary evidence of Drs. Huggins's and Whiteley's conception, development, and invention of certain claims of the '574 patent is shown in the table included in Paragraph 79 above.

146.     Mr. Pattillo did not contribute as an inventor to any of the claims of the '574 patent. However, Mr. Pattillo was aware of Drs. Huggins's and Whiteley's inventions because—while working under an NDA—Mr. Pattillo had access to Drs. Huggins's and Whiteley's lab at Argonne; the trade secret, confidential, and proprietary processes and tests that Drs. Huggins and Whiteley directed and performed in that lab; the trade secret, confidential, and proprietary data, results, and conclusions generated from the experiments performed in that lab; and the trade secret, confidential, and proprietary master electronic laboratory notebook and other documents and materials he was provided (and the inventions recorded therein). Mr. Pattillo also conducted experiments covering trade secret, confidential, and proprietary techniques that Drs. Huggins and Whiteley had invented (under the guidance and direction of Drs. Huggins and Whiteley).

147.     Drs. Huggins and Whiteley were improperly omitted as the inventors of the '574 patent. Mr. Pattillo was improperly included as an inventor of the '574 patent.

148.     In the alternative, and at a minimum, Drs. Huggins and Whiteley were improperly omitted as co-inventors of the '574 patent.

149.     This Court may order correction of the '574 patent on notice and hearing of all parties concerned, and the Director shall issue a certificate accordingly. *See* 35 U.S.C. § 256.

## **COUNT 5**
### **Correction of Inventorship of U.S. Patent No. 11,470,871 – All Defendants**
### **(35 U.S.C. § 256)**

150.     Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 149 of these Counterclaims.

151.     Mr. Pattillo is listed as the sole inventor of the '871 patent.

152.     Drs. Huggins and Whiteley are the exclusive, true, and correct inventors of the '871 patent.

153.    Drs. Huggins and Whiteley together developed, conceived of, and invented the subject matter of the '871 patent. Exemplary evidence of Drs. Huggins's and Whiteley's conception, development, and invention of certain claims of the '871 patent is shown in the table included in Paragraph 79 above.

154.    Mr. Pattillo did not contribute as an inventor to any of the claims of the '871 patent. However, Mr. Pattillo was aware of Drs. Huggins's and Whiteley's inventions because—while working under an NDA—Mr. Pattillo had access to Drs. Huggins's and Whiteley's lab at Argonne; the trade secret, confidential, and proprietary processes and tests that Drs. Huggins and Whiteley directed and performed in that lab; the trade secret, confidential, and proprietary data, results, and conclusions generated from the experiments performed in that lab; and the trade secret, confidential, and proprietary master electronic laboratory notebook and other documents and materials he was provided (and the inventions recorded therein). Mr. Pattillo also conducted experiments covering trade secret, confidential, and proprietary techniques that Drs. Huggins and Whiteley had invented (under the guidance and direction of Drs. Huggins and Whiteley).

155.    Drs. Huggins and Whiteley were improperly omitted as the inventors of the '871 patent. Mr. Pattillo was improperly included as an inventor of the '871 patent.

156.    In the alternative, and at a minimum, Drs. Huggins and Whiteley were improperly omitted as co-inventors of the '871 patent.

157.    This Court may order correction of the '871 patent on notice and hearing of all parties concerned, and the Director shall issue a certificate accordingly. *See* 35 U.S.C. § 256.

## COUNT 6
### Correction of Inventorship of U.S. Patent No. 11,478,006 – All Defendants
### (35 U.S.C. § 256)

158.    Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 157 of these Counterclaims.

159.    Mr. Pattillo is listed as the sole inventor of the '006 patent.

160.    Drs. Huggins and Whiteley are the exclusive, true, and correct inventors of the '006 patent.

161.    Drs. Huggins and Whiteley together developed, conceived of, and invented the subject matter of the '006 patent. Exemplary evidence of Drs. Huggins's and Whiteley's conception, development, and invention of certain claims of the '006 patent is shown in the table included in Paragraph 79 above.

162.    Mr. Pattillo did not contribute as an inventor to any of the claims of the '006 patent. However, Mr. Pattillo was aware of Drs. Huggins's and Whiteley's inventions because—while working under an NDA—Mr. Pattillo had access to Drs. Huggins's and Whiteley's lab at Argonne; the trade secret, confidential, and proprietary processes and tests that Drs. Huggins and Whiteley directed and performed in that lab; the trade secret, confidential, and proprietary data, results, and conclusions generated from the experiments performed in that lab; and the trade secret, confidential, and proprietary master electronic laboratory notebook and other documents and materials he was provided (and the inventions recorded therein). Mr. Pattillo also conducted experiments covering trade secret, confidential, and proprietary techniques that Drs. Huggins and Whiteley had invented (under the guidance and direction of Drs. Huggins and Whiteley).

163.    Drs. Huggins and Whiteley were improperly omitted as the inventors of the '006 patent. Mr. Pattillo was improperly included as an inventor of the '006 patent.

164.    In the alternative, and at a minimum, Drs. Huggins and Whiteley were improperly omitted as co-inventors of the '006 patent.

165.    This Court may order correction of the '006 patent on notice and hearing of all parties concerned, and the Director shall issue a certificate accordingly. *See* 35 U.S.C. § 256.

## **COUNT 7**
### **Conversion – All Defendants**

166.    Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 165 of these Counterclaims.

167.    Emergy is the rightful owner and possessor of certain experimental samples and certain documents and other materials, both electronic and physical, in which it recorded, among other things, its data and notes regarding experimental inputs, methodologies, results, conclusions, and methodological adjustments.

168.     On information and belief, upon abandoning his position as a junior lab technician intern for Emergy at Argonne, Mr. Pattillo removed, carried away, and conveyed to BMC or, in the alternative, retained possession of certain of Emergy's samples, documents, and materials without Emergy's consent, without legal justification, and in a manner otherwise inconsistent with Emergy's ownership and possessory rights in said samples, documents, and materials. On information and belief, Mr. Pattillo did this knowingly and intentionally, with the full understanding that such samples, documents, and materials rightfully belonged to Emergy.

169.     On information and belief, BMC took sole possession of Emergy's samples, documents, and materials or, in the alternative, joint possession of said samples, documents, and materials with Mr. Pattillo upon their conveyance by Mr. Pattillo without Emergy's consent, without legal justification, and in a manner otherwise inconsistent with Emergy's ownership and possessory rights in said samples, documents, and materials. On information and belief, BMC did this knowingly and intentionally, with the full understanding that such samples, documents, and materials rightfully belonged to Emergy.

170.     On information and belief, Mr. Pattillo's or BMC's illicit sole possession of, or Mr. Pattillo's and BMC's illicit joint possession of, Emergy's samples, documents, and materials continues to the present day.

171.     Mr. Pattillo's misuse and Mr. Pattillo's or BMC's illicit sole possession, or Mr. Pattillo's and BMC's illicit joint possession, of Emergy's samples, documents, and materials has caused and continues to cause Emergy to suffer economic injuries and irreparable harm.

**COUNT 8**
**Unfair Competition – All Defendants**
**(Cal. Bus. & Prof. Code § 17200 *et seq.*)**

172.     Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 171 of these Counterclaims.

173.     Emergy is the rightful owner and possessor of certain confidential and proprietary information including, but not limited to, the confidential and proprietary information in its SBIR proposal not designated as trade secret information by inclusion of vertical lines in the side margin. Emergy is the rightful owner and possessor of certain experimental samples and certain documents

and other materials, both electronic and physical, in which it recorded, among other things, its data and notes regarding experimental inputs, methodologies, results, conclusions, and methodological adjustments.

174.    Mr. Pattillo has engaged in unfair methods of competition, including unlawful, unfair, and/or fraudulent acts or practices in the conduct of trade and commerce in violation of Section 17200 *et seq.* of the California Business & Professional Code, at least by (1) breaching his NDA with Emergy; (2) disclosing and using Emergy's confidential and proprietary information in association with BMC to develop BMC's competing business, mycoprotein fermentation facility in Sacramento, and "Rhiza" product (which directly competes with Emergy's alternative meat products); (3) disclosing Emergy's confidential and proprietary information in association with BMC through published patent applications and issued patents; (4) improperly assigning the '137 patent, the '574 patent, the '871 patent, the '006 patent, the '925 application, the '236 application, the '745 application, the '725 application, the '214.8 application, and the '852.8 application to BMC and improperly listing himself as the sole inventor of each of said patents and applications; and (5) improperly converting samples, documents, and materials belonging to Emergy, all in an effort to gain an unfair competitive advantage over Emergy.

175.    BMC has engaged in unfair methods of competition, including unlawful, unfair, and/or fraudulent acts or practices in the conduct of trade and commerce in violation of Section 17200 *et seq.* of the California Business & Professional Code, at least by (1) disclosing and using Emergy's confidential and proprietary information in association with Mr. Pattillo to raise and accumulate investments and develop its competing business, mycoprotein fermentation facility in Sacramento, and "Rhiza" product (which directly competes with Emergy's alternative meat products); (2) disclosing Emergy's confidential and proprietary information in association with Mr. Pattillo through published patent applications and issued patents; (3) improperly assigning the '137 patent, the '574 patent, the '871 patent, the '006 patent, the '925 application, the '236 application, the '745 application, the '725 application, the '214.8 application, and the '852.8 application to itself and improperly listing Mr. Pattillo as the sole inventor of each of said patents and applications; and

(4) improperly converting samples, documents, and materials belonging to Emergy, all in an effort to gain an unfair competitive advantage over Emergy.

176.    Mr. Pattillo's and BMC's unfair business practices have unjustly diminished Emergy's competitive advantage and have caused and are causing Emergy to suffer economic injuries.

177.    As a result of such unfair competition, Emergy has also suffered irreparable injury and will continue to suffer irreparable injury in the absence of an injunction.

**COUNT 9**
**Unjust Enrichment – All Defendants**

178.    Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 177 of these Counterclaims.

179.    Emergy is the rightful owner and possessor of certain confidential and proprietary information including, but not limited to, the confidential and proprietary information in its SBIR proposal not designated as trade secret information by inclusion of vertical lines in the side margin.

180.    The confidential and proprietary information that BMC and Mr. Pattillo have stolen from Emergy has conferred and continues to confer a benefit on BMC and Mr. Pattillo, who have used and, on information and belief, continue to use this information to develop BMC's competing business, its mycoprotein fermentation facility in Sacramento, and its "Rhiza" product (which directly competes with Emergy's alternative meat products). Because of this benefit that BMC and Mr. Pattillo have illegitimately obtained, BMC and Mr. Pattillo have taken undeserved market share, sales, investors, talent, and advertising space from Emergy.

181.    BMC and Mr. Pattillo are aware of Emergy's rights in its confidential and proprietary information, and they are aware of the benefits they have received and continue to receive from illegitimately taking and using this information.

182.    It is inequitable for BMC and Mr. Pattillo to retain the benefit of Emergy's confidential and proprietary information without paying Emergy for it.

1
2

### COUNT 10
### Breach of Contract – Mr. Pattillo

3       183.   Emergy repeats and realleges each and every allegation set forth in Paragraphs 1
4   through 182 of these Counterclaims.

5       184.   The NDA is a valid and enforceable contract. The NDA is attached to these
6   Counterclaims as Exhibit 1.

7       185.   After receiving the NDA from Dr. Huggins to sign, Mr. Pattillo completed and
8   returned what he called the "signed non-disclosure agreement." Mr. Pattillo also changed the file
9   name of the NDA document he signed from "Emergy Unilateral NDA" to "Signed Emergy
10  Unilateral NDA.pdf." By these actions, Mr. Pattillo agreed to be bound by the provisions of the
11  NDA. Drs. Huggins and Whiteley subsequently shared Emergy's trade secret, confidential, and
12  proprietary information with Mr. Pattillo under this agreement with the understanding that he was
13  under an obligation to limit the use of, maintain the confidentiality of, and not disclose such
14  information.

15      186.   The NDA defines "Confidential Information" as follows:

16         "***Confidential Information***" means a [*sic*] any and all technical and
17  non-technical information provided by EM[3] to Recipient[4] including,
    but not limited to, all tangible, intangible, visual, electronic, present, or
18  future information such as: (a) patent and patent applications, (b) trade
    secrets; (c) proprietary and confidential information, including, but not
19  limited to, ideas, techniques, sketches, drawings, works of authorship,
    models, inventions, know-how, processes, apparatuses, equipment,
20  related to current, future, and proposed products and services of EM; (d)
    financial information, including pricing; (e) technical information,
21  including research, development, procedures, algorithms, data, designs,
    and know-how; (f) business information, including operations,
22  planning, marketing interests, and products; (g) the terms of any
    agreement between EM and Recipient and the discussions, negotiations
23  and proposals related to that agreement; and (h) information which
    would, due to the nature of information disclosed or the circumstances
24  surrounding disclosure, appear to a reasonable person to be confidential
    or proprietary.

25  Ex. 1, ¶ 2.

26

27  _____
    [3] The nondisclosure agreement refers to Emergy as "EM."

28  [4] The nondisclosure agreement refers to Mr. Pattillo as the "Recipient."

187.     Under Section 3.1 of the NDA, Mr. Pattillo agreed "not to use any Confidential Information disclosed to [him] by EM for [his] own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship," to "not disclose or permit disclosure of any Confidential Information to third parties or to employees of Recipient," and to "take all reasonable measures to protect the secrecy of, and avoid disclosure or use of, Confidential Information of EM in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information." *Id.*, ¶ 3.1.

188.     Section 7 of the NDA also prohibits the "export" of any United States technical data acquired pursuant to the NDA. *Id.*, ¶ 7.

189.     Emergy has performed all of its conditions, covenants, and promises under the NDA.

190.     Mr. Pattillo has materially breached the NDA by, among other things, disclosing Emergy's trade secret, confidential, and proprietary information to and using it for BMC; using Emergy's trade secret, confidential, and proprietary information to develop BMC's business, mycoprotein fermentation facility in Sacramento, and "Rhiza" product; and disclosing Emergy's trade secret, confidential, and proprietary information to the general public by filing patent applications that became public upon their publication.

191.     On information and belief, Mr. Pattillo also materially breached the NDA by disclosing Emergy's trade secret, confidential, and proprietary information to foreign nationals and/or foreign investors, including Lever VC.

192.     Under Section 12 of the NDA, Emergy is contractually entitled to injunctive relief against Mr. Pattillo for his breach of the NDA. *Id.*, ¶ 12. Under Section 12 of the NDA, Emergy is also contractually entitled to reasonable attorney's fees and costs arising from Mr. Pattillo's breach. *Id.*

193.     Emergy has incurred substantial damages and suffered irreparable injury as a result of Mr. Pattillo's breach.

## **COUNT 11**
### **Breach of Implied Contract – Mr. Pattillo**

194.     Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 193 of these Counterclaims.

195.     To the extent the NDA is not a valid and enforceable contract, there exists an implied contract between Mr. Pattillo and Emergy.

196.     The communications between and conduct of Mr. Pattillo and Emergy show a mutual intention and understanding that Mr. Pattillo was obligated to limit the use of, maintain the confidentiality of, and not disclose Emergy's trade secret, confidential, and proprietary information. After receiving an NDA from Dr. Huggins to sign, Mr. Pattillo completed and returned what he called the "signed non-disclosure agreement." Mr. Pattillo also changed the file name of the NDA document he signed from "Emergy Unilateral NDA" to "Signed Emergy Unilateral NDA.pdf." By these actions, Mr. Pattillo expressed an intention to limit the use of, maintain the confidentiality of, and not disclose Emergy's trade secret, confidential, and proprietary information. Drs. Huggins and Whiteley subsequently shared Emergy's trade secret, confidential, and proprietary information with Mr. Pattillo with the understanding that Mr. Pattillo had expressed an intention to limit its use, maintain its confidentiality, and not disclose it. The parties mutually understood that Mr. Pattillo was required to agree to these obligations before obtaining access to Emergy's trade secret, confidential, and proprietary information. The parties, therefore, had an implied contract that required Mr. Pattillo to limit the use of, maintain the confidentiality of, and not disclose Emergy's trade secret, confidential, and proprietary information.

197.     Emergy continued to provide its trade secret, confidential, and proprietary information to Mr. Pattillo with the understanding that Mr. Pattillo had expressed an intention to limit its use, maintain its confidentiality, and not disclose it.

198.     Mr. Pattillo has materially breached the implied contract by, among other things, disclosing Emergy's trade secret, confidential, and proprietary information to and using it for BMC; using Emergy's trade secret, confidential, and proprietary information to develop BMC's business, mycoprotein fermentation facility in Sacramento, and "Rhiza" product; and disclosing Emergy's

1    trade secret, confidential, and proprietary information to the general public by filing patent

2    applications that became public upon their publication.

3         199.   Emergy has incurred substantial damages and suffered irreparable injury as a result of

4    Mr. Pattillo's breach.

5                                    **COUNT 12**

6              **Inducement to Breach of Contract – The Better Meat Co.**

7         200.   Emergy repeats and realleges each and every allegation set forth in Paragraphs 1

8    through 199 of these Counterclaims.

9         201.   Emergy is the rightful owner and possessor of certain confidential and proprietary

10   information including, but not limited to, the confidential and proprietary information in its SBIR

11   proposal not designated as trade secret information by inclusion of vertical lines in the side margin.

12        202.   Emergy and Mr. Pattillo entered into a valid and enforceable NDA under which Mr.

13   Pattillo agreed "not to use any Confidential Information disclosed to [him] by EM for [his] own use

14   or for any purpose other than to carry out discussions concerning, and the undertaking of, the

15   Relationship," to "not disclose or permit disclosure of any Confidential Information to third parties

16   or to employees of Recipient," and to "take all reasonable measures to protect the secrecy of, and

17   avoid disclosure or use of, Confidential Information of EM in order to prevent it from falling into the

18   public domain or the possession of persons other than those persons authorized under this

19   Agreement to have any such information." Ex. 1, ¶ 3.1.

20        203.   BMC was not a party to the NDA.

21        204.   On information and belief, BMC had actual or constructive knowledge of the NDA

22   between Emergy and Mr. Pattillo and had actual or constructive knowledge that Mr. Pattillo had

23   access to Emergy confidential and proprietary information that was subject to the NDA.

24        205.   On information and belief, BMC knowingly and intentionally induced Mr. Pattillo to

25   breach the NDA and disclose Emergy's confidential and proprietary information to BMC; use said

26   information to develop BMC's business, mycoprotein fermentation facility in Sacramento, and

27   "Rhiza" product and to otherwise benefit BMC; and disclose said information in patent applications

28   to assign to BMC. Specifically, BMC induced Mr. Pattillo to do so by, at minimum, offering Mr.

Pattillo a high-ranking position (i.e., his CTO position) within BMC's corporate structure (as well as a salary befitting such a position) and resources in the form of funding, infrastructure, and labor with which he could achieve his professional aspirations and shape BMC's technological development through the exploitation of Emergy's confidential and proprietary information.

206. On information and belief, BMC committed these acts with knowledge of their wrongfulness, with the intent to injure Emergy's business, and in conscious disregard of BMC's legal obligations to refrain from such acts.

207. On information and belief, Mr. Pattillo materially breached the NDA in response to BMC's inducement by, among other things, disclosing Emergy's confidential and proprietary information to BMC; using said information to develop BMC's business, mycoprotein fermentation facility in Sacramento, and "Rhiza" product and to otherwise benefit BMC; and disclosing said information in patent applications that he later assigned to BMC.

208. Emergy has incurred substantial damages and suffered irreparable injury as a result of BMC's inducement of Mr. Pattillo's breach of his NDA with Emergy.

## COUNT 13
### Tortious Interference – The Better Meat Co.

209. Emergy repeats and realleges each and every allegation set forth in Paragraphs 1 through 208 of these Counterclaims.

210. Emergy is the rightful owner and possessor of certain confidential and proprietary information including, but not limited to, the confidential and proprietary information in its SBIR proposal not designated as trade secret information by inclusion of vertical lines in the side margin.

211. Emergy has current and future business and economic relationships with various customers and potential customers. These relationships confer an existing economic benefit and a strong probability of future economic benefit to Emergy.

212. On information and belief, BMC had knowledge of the existence of these economic relationships, at least because some are public and/or because some involve potential customers of both Emergy and BMC, who are direct competitors in the same market for the same customers and prospective customers. On information and belief, BMC intentionally interfered with these

relationships by using confidential and proprietary information misappropriated from Emergy to attract those customers.

213.    BMC's intentional acts actually disrupted Emergy's relationships with current and potential customers and caused economic harm to Emergy, including at least the lost economic benefit of securing deals with those customers and potential customers.

## **PRAYER FOR RELIEF**

WHEREFORE, Emergy requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including the following:

A.    Preliminary and permanent injunctive relief;

B.    Damages for actual loss and unjust enrichment in an amount to be determined at trial;

C.    Restitution;

D.    Punitive damages;

E.    Exemplary damages;

F.    A declaration that Drs. Huggins and Whiteley are the exclusive inventors of the '137 patent, the '574 patent, the '871 patent, and the '006 patent;

G.    An order to the Director of the USPTO to correct the inventorship of the '137 patent, the '574 patent, the '871 patent, and the '006 patent to remove Mr. Pattillo as an inventor and to list Drs. Huggins and Whiteley as inventors;

H.    An order that BMC must assign the '137 patent, the '574 patent, the '871 patent, and the '006 patent to Emergy;

I.    Attorney's fees and costs;

J.    Interest; and

K.    All such other and further relief as the Court may deem just, proper, and equitable.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Emergy respectfully demands a trial by jury on all issues properly triable by a jury in this action.

Dated: November 2, 2022

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP


By: ___/s/ David K. Mroz_____
    David K. Mroz
    *Attorney for Defendant and Counterclaimant*
    *Emergy Inc.*